**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LONG BEACH AREA PEACE
NETWORK; DIANA MANN,
          *Plaintiffs-Appellees,*

          v.

CITY OF LONG BEACH, a municipal
corporation,
          *Defendant-Appellant.*

No. 05-55083

D.C. No.
CV-04-08510-SJO

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
S. James Otero, District Judge, Presiding

Argued and Submitted
February 16, 2007—Pasadena, California

Filed April 15, 2008
Amended July 24, 2009

Before: Harry Pregerson, William A. Fletcher, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge William A. Fletcher;
Concurrence by Judge Berzon

9521

## COUNSEL

Randall C. Fudge, Long Beach City Attorney's Office, Long Beach, California, for the appellant.

Carol A. Sobel, Santa Monica, California, for the appellees.

## ORDER

The opinion filed on April 15, 2008 and reported at 522 F.3d 1010 is amended as follows:

(1)   At 522 F.3d at 1022, following the first citation sentence for *Ward v. Rock Against Racism*, insert the following sentence:

*But see FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225-30 (1990) (invalidating as an impermissible prior restraint a licensing ordinance regulating the use of private property).

(2)   At 522 F.3d at 1022, at the end of the first paragraph, change the citation from "*Id.*" to "*Ward*, 491 U.S. at 795 n.5."

(3)   In the last paragraph at 522 F.3d at 1023, after the citation sentence for *Ward*, insert the following text:

> The Supreme Court has cautioned that "this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.*

The panel has unanimously voted to deny the petition for panel rehearing and the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc and no judge has requested a vote to rehear the matter en banc. *See* Fed. R. App. P. 35(b). The petitions are DENIED. The court will not accept any further petitions for rehearing or rehearing en banc.

IT IS SO ORDERED.

---

## OPINION

W. FLETCHER, Circuit Judge:

We review the constitutionality of § 5.60 of the City of Long Beach Municipal Code ("LBMC" or "Ordinance"). Appellees Long Beach Area Peace Network and Diana Mann (collectively "the Peace Network") challenged § 5.60 under the First Amendment after the City of Long Beach ("the

City") sought payment of administrative fees associated with a march and rally held by the Peace Network on March 22, 2003. The district court held that § 5.60 in its entirety unconstitutionally restricts the right to free speech and permanently enjoined the City from enforcing it. We affirm in part and reverse in part.

We hold that five challenged features of § 5.60 are constitutional: (1) the provisions distinguishing between expressive activity and other activity; (2) the provision allowing the City Manager to impose conditions to meet stated purposes; (3) the provision authorizing the City Manager to obtain proof of indigent status; (4) the provision authorizing the City Manager to require a permittee to obtain insurance; and (5) the provision authorizing criminal penalties for violations of the Ordinance. However, we hold that four other features are unconstitutional: (1) part of the provision defining "special events"; (2) the provision applicable to "spontaneous" events; (3) the hold-harmless and indemnification provision; and (4) the provisions authorizing waiver of permit fees and departmental services charges.

We remand to allow the district court to determine whether the unconstitutional provisions are severable from the remainder of § 5.60.

## I.    Background

As described by the district court, the Long Beach Area Peace Network is "an unincorporated, loosely organized group of peace activists without an office, organizational phone, organizational email or insurance." On February 15, 2003, before the beginning of the Iraq War, the Peace Network sponsored a protest march and rally in the City of Long Beach, California. In preparation for the event, Dr. Eugene Ruyle ("Ruyle"), a retired professor and Peace Network member, submitted an application for a "special event" permit, as required by § 5.60.020(A). Long Beach Municipal Code

("LBMC") § 5.60.020(A) (1999). After negotiating the march route with Ruyle, the City approved the permit.

The march was conducted on public streets along the route suggested by the City. The event concluded with a rally in Bixby Park, a public park in the City. Several elected officials, including a City Council member and a State Assembly member, participated in the rally. According to some estimates, between 1,000 and 1,500 people attended the event.

The permit application, signed by Ruyle in February 2003, provided that the Peace Network would "hold the City harmless from any liability caused by the conduct of the event"; that the "City will not be liable for any mishaps or injuries associated with the event"; and that "[f]ull responsibility for activities at the event will be assumed by [the Peace Network]." The application also provided that the Peace Network would "be responsible for all costs incurred by City departments for use of City personnel and/or equipment." After submitting the application, Ruyle wrote a letter to the City requesting a waiver of the permit application fee and the departmental services charges imposed under § 5.60. The City did not assess any fee or charges for the February event.

On March 20, 2003, approximately one month later, the United States launched an aerial assault on Baghdad. In anticipation of the assault, the Peace Network had already organized another march and rally, to be held on March 22. Ruyle had submitted a letter to the City on or about March 18 describing the anticipated "spontaneous" event. Section 5.60 defines a "spontaneous" event as one "occasioned by news or affairs coming into public knowledge within five (5) days" of the event. *See* LBMC § 5.60.030(A)(5). A "spontaneous" event does not require a formal permit, but it does require twenty-four hours advance notice to the City. The City Manager may refuse permission to hold such an event, and may impose "reasonable time, place and manner restrictions." *See* LBMC § 5.60.030(B). An initial email from Ruyle to the

City, sent two weeks earlier, had indicated that the Peace Network planned to ask for the closure of at least one lane of traffic for the march and to reserve a bandshell in Bixby Park for the rally. In his email, Ruyle estimated that the March event would be "at least twice as big" as the February march and rally.

In a letter addressed to Ruyle dated March 21, the City granted permission to conduct a march and rally on March 22. In the letter, the City imposed a number of conditions, including the route of the march and the location of the rally. The letter contained a summary of estimated departmental services charges for "Police," "Public Works," "Park, Recreation & Marine (Park Staff)," "Parks, Recreation & Marine Maintenance," "Space Permit Fee," and "Junipero Parking Lot." The total estimated charges were $7,041. The letter set forth a schedule of payment in four equal installments during the next year. Ruyle and other members of the Peace Network signed the last page of the letter under a heading reading "Conditions Accepted." As signed, this page contained a handwritten notation at the top, stating that the "signers reserve[d] the right to challenge the total," but that they would pay the first of the four installments on March 22. Ruyle paid the first installment on March 22, in accordance with the handwritten notation.

The march on March 22 took slightly more than one hour, and the event concluded with an anti-war rally at Bixby Park. The district court found that approximately 1,000 people participated in the March event. According to Ruyle's declaration, in contrast to the pre-war rally at the park in February, no elected officials participated in the March anti-war rally.

As part of the March event, members of the Surfrider Foundation placed surfboards on the beach in the shape of a peace symbol. The display was visible to participants of the march as they walked near the beach. The display took place entirely on the beach, did not interfere with any vehicular or pedes-

trian traffic, and did not result in any damage to the beach. Following the event, the surfboards were removed from the beach.

In his initial email, Ruyle had stated that Peace Network planned to request a waiver of insurance and departmental services charges. In its March 21 letter granting the permit, the City waived the insurance requirement but did not waive event-related charges. As he had done after the February march and rally, Ruyle wrote a letter to the City after the March event asking for a waiver of charges. Ruyle states in his declaration that a city official gave "no other guidelines than simply to write the letter" to ask for a waiver. The only material differences between Ruyle's requests for waivers of charges for the February and March events were descriptions of event-specific matters such as the march routes.

The City did not waive the departmental services charges for the March event. In April 2003, the City sent a letter to the Peace Network members whose signatures (or, in the case of Diana Mann, whose name had been signed by someone else) appeared at the bottom of the March 21 letter. The letter requested payment of $7,041, in the installments specified in the March letter. The total amount was exactly the same as the estimate contained in that letter. Part of the total included a charge of $1,500 for the use of the beach for the surfboard display. The City's April letter noted that the first check, which Ruyle had given to the City on March 22, had been misplaced. The letter asked that payment on that check be stopped and that a new check be written for that amount. Peace Network members did not write a new check or make any of the requested payments.

The City filed an action in state Superior Court against Diana Mann and the Peace Network members who had signed the agreement. The court granted judgment of $5,901 for the City. That amount excluded the $1,500 charge for the use of the beach for the surfboard display because, according to the

Superior Court, that charge was "not sufficiently justified as to actual costs" and was "an improper restraint of expression."

The Peace Network then filed a "facial challenge" to § 5.60 in federal district court, seeking declaratory and injunctive relief, compensatory damages, and attorney's fees and costs. The complaint alleged that the City's "past, present and threatened future actions" violate the First Amendment. The district court concluded that the entirety of § 5.60 constitutes an unconstitutional restraint on speech and assembly and entered a permanent injunction prohibiting its enforcement. The City timely appealed.

After the district court's decision and after initial briefing was completed on appeal, we decided *Santa Monica Food Not Bombs v. City of Santa Monica* ("*Food Not Bombs*"), 450 F.3d 1022 (9th Cir. 2006), assessing the constitutionality of a similar ordinance in Santa Monica, California. We asked the parties to file supplemental briefs addressing our decision in *Food Not Bombs*.

## II.    Standard of Review

We review de novo the district court's holding of unconstitutionality. *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 648 (9th Cir. 2006). We also review de novo the district court's determinations on mixed questions of law and fact that implicate the question of constitutionality. *Rosenbaum v. City & County of San Francisco*, 484 F.3d 1142, 1152 (9th Cir. 2007). We generally review for clear error the district court's findings of fact. *Gaudiya Vaishnava Soc'y v. City & County of San Francisco*, 952 F.2d 1059, 1062 (9th Cir. 1991) (as amended). However, we conduct an independent review of the facts for the "issues arising under the First Amendment." *Rosenbaum*, 484 F.3d at 1152.

## III.    Nature of the Challenge

[1] The Peace Network's complaint asserts a facial challenge to § 5.60. As an initial matter, we conclude that the

Peace Network has Article III standing to bring this challenge. Standing, in the constitutional sense, requires that plaintiffs establish (1) a "distinct and palpable" injury in fact (2) that is "fairly traceable" to the challenged provision and (3) that would "likely . . . be redressed" by a favorable decision for the plaintiff. *Allen v. Wright*, 468 U.S. 737, 750-51 (1984) (internal quotation marks omitted); *see Food Not Bombs*, 450 F.3d at 1033. Plaintiffs mounting a facial challenge to an ordinance may establish standing by alleging that they have "modified [their] behavior" as a result of the ordinance, such as "by choosing locations other than [the areas subject to the ordinance]." *Id.* at 1034. A plaintiff "need not apply for a benefit conditioned by a facially unconstitutional law," *United States v. Baugh*, 187 F.3d 1037, 1041 (9th Cir. 1999), but must demonstrate a "serious[ ] interest[ ] in subjecting [it]self to" the challenged measure, and must demonstrate that "the defendant [is] seriously intent on enforcing[ ] the challenged measure," *NAACP v. City of Richmond*, 743 F.2d 1346, 1351 (9th Cir. 1984).

[2] The Peace Network organized two separate events covered by § 5.60. The City assessed departmental services charges against the Peace Network for the second event and brought suit in state court to obtain payment. The Peace Network has provided evidence that it has modified its behavior as a result of § 5.60 by declining to hold such events in Long Beach in the future because of the City's enforcement of the Ordinance. *See Food Not Bombs*, 450 F.3d at 1034. The Peace Network states that if the permanent injunction against the enforcement of § 5.60 is upheld, it will hold expressive events in Long Beach. The Peace Network has thus established injury in fact that is fairly traceable to § 5.60 and that is likely to be redressed if its First Amendment suit is successful.

The Peace Network claims that several provisions of the LBMC "allegedly vest[ ] unbridled discretion in a government official over whether to permit or deny expressive activity." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750,

755-56 (1998). There are two primary rationales for allowing this type of facial challenge.

> First, the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused. . . . Second, the absence of express standards makes it difficult to distinguish, "as applied," between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power.

*Id.* at 757-58; *see also S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1134-35 (9th Cir. 2004). Hence, "[f]acial attacks on the discretion granted a decisionmaker are not dependent on the facts surrounding any particular permit decision." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 133 n.10 (1992). The Court wrote in *Thornhill v. Alabama*, 310 U.S. 88, 97-98 (1940) (citations omitted):

> [T]he rule is not based upon any assumption that application for the license would be refused or would result in the imposition of other unlawful regulations. Rather it derives from an appreciation of the character of the evil inherent in a licensing system. The power of the licensor . . . is pernicious not merely by reason of the censure of particular comments but by reason of the threat to censure comments on matters of public concern. It is . . . the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion. . . . Where regulations of the liberty of free discussion are concerned, there are special reasons for observing the rule that it is the statute, and not the accusation or the evidence under it, which prescribes the limits of permissible conduct and warns against transgression.

To assert this type of facial challenge, a plaintiff must meet two requirements. First, a plaintiff must satisfy the standing requirements of Article III by showing that the challenged provision or provisions apply to its conduct. *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 798 (1984) ("Such holdings invalidated entire statutes, but did not create any exception from the general rule that constitutional adjudication requires a review of the application of a statute to the conduct of the party before the Court."). As noted above, the Peace Network has Article III standing.

Second, the challenged ordinance "must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." *City of Lakewood*, 486 U.S. at 759. We conclude that § 5.60 has a sufficient nexus to expression to satisfy the second requirement. Section 5.60 governs use of the traditional public fora of public streets, sidewalks, and parks. Indeed, some of the provisions specifically apply to persons engaged in "expressive activity." *See, e.g.*, LBMC § 5.60.040(B) ("[Special event permit] applications for expressive activities [involving the use of city streets, sidewalks, or parks] shall be filed in accordance with subsection D of this section."). The Peace Network has engaged in, and seeks to engage in, public marches and rallies on the streets, sidewalks, and parks of Long Beach. "[M]ass gatherings [to show support for a cause] bear a sufficient nexus to conduct commonly associated with expression." *S. Or. Barter Fair*, 372 F.3d at 1136. Section 5.60 regulates those mass gatherings and therefore has a "close connection to expression" because it "regulates conduct which is itself protected speech." *See Gaudiya Vaishnava Soc'y*, 952 F.2d at 1062-63.

**[3]** We therefore conclude that the Peace Network has satisfied the additional requirements to raise a facial challenge on unbridled discretion grounds.

## IV.    General Considerations

The First Amendment prohibits Congress from enacting laws "abridging the freedom of speech, . . . or the right of the people peaceably to assemble." U.S. Const. amend. I. The Supreme Court has extended the protection of the First Amendment to the states. *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963); *Thornhill*, 310 U.S. at 95; *Hague v. C.I.O.*, 307 U.S. 496, 512 (1939). Three types of speech regulation are presumptively invalid: regulations on speech protesting government action, regulations affecting speech in a traditional public forum, and prior restraints. By meeting certain criteria, content-neutral time, place and manner restrictions may overcome the presumption of invalidity.

### A.    Presumptively Invalid Regulations

### 1.    Regulation of Speech Protesting Government Action

We have recognized that certain types of speech enjoy special status. *See, e.g.*, *Nat'l Adver. Co. v. City of Orange*, 861 F.2d 246, 248 (9th Cir. 1988) ("The first amendment affords greater protection to noncommercial than to commercial expression."). Political speech is core First Amendment speech, critical to the functioning of our democratic system. The Peace Network's protest of the United States military action in Iraq is the type of speech that "rest[s] on the highest rung of the hierarchy of First Amendment values." *See Carey v. Brown*, 447 U.S. 455, 467 (1980); *see also Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."); *Thornhill*, 310 U.S. at 95 ("Those who won our independence had confidence in the power of free and fearless reasoning and communication of ideas to discover and spread political and economic truth. Noxious doctrines in those fields may be refuted and their evil averted by the courageous exercise of the right of free discussion.").

The Supreme Court has recognized that "the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907 (1982) (quoting *Citizens Against Rent Control / Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 294 (1981)); *see also Edwards*, 372 U.S. at 235 (stating that peaceable assembly at the site of the state government to protest government action is the "most pristine and classic form" of exercising First Amendment rights). In *United States v. Baugh*, we wrote that the First Amendment "applie[d] with particular force" to a "march and other protest activities." 187 F.3d at 1042; *see also Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 611 (6th Cir. 2005) ("[P]arades and processions are a unique and cherished form of political expression, serving as a symbol of our democratic tradition. There is scarcely a more powerful form of expression than the political march."). We have also noted the importance of timely opportunity to express political views by staging a political march. *City of Richmond*, 743 F.2d at 1356 ("[T]iming is of the essence in politics . . . . [W]hen an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all. A delay of even a day or two may be intolerable when applied to political speech in which the element of timeliness may be important." (internal quotation marks and citation omitted; alterations in *City of Richmond*)).

### 2.   Regulation of Speech in Traditional Public Fora

The Supreme Court has established different levels of scrutiny for analyzing alleged First Amendment violations, depending on where the speech takes place. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983). In traditional public fora, "the government's ability to permissibly restrict expressive conduct is very limited." *United States v. Grace*, 461 U.S. 171, 177 (1983). In such locations, First Amendment protections are strongest and reg-

ulation is most suspect. *Grossman v. City of Portland*, 33 F.3d 1200, 1204 (9th Cir. 1994). "Public fora have achieved a special status in our law; the government must bear an extraordinarily heavy burden to regulate speech in such locales." *City of Richmond*, 743 F.2d at 1355.

"Public open spaces" such as parks are distinguished from streets because their use for expressive activities rarely implicates other important governmental interests. *Food Not Bombs*, 450 F.3d at 1042. Public parks and sidewalks "are uniquely suitable for public gatherings and the expression of political or social opinion." *ACORN v. City of Phoenix*, 798 F.2d 1260, 1267 n.5 (9th Cir. 1986). Courts have recognized a somewhat greater governmental interest in regulating expressive activity on city streets because of the public safety concerns raised by vehicular traffic. *Id.* at 1267. Nonetheless, we have rejected the proposition that "the Supreme Court's designation of streets as public fora" is limited to "sidewalks and other locales traditionally reserved for public communication." *Id.* at 1266. The Supreme Court has recognized that "[n]o particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora." *Frisby v. Schultz*, 487 U.S. 474, 481 (1988).

Traditional public fora gain even more importance when they are host to core First Amendment speech. *See, e.g.*, *Hague*, 307 U.S. at 515-16. In *Grossman v. City of Portland*, we explained that the "venerable tradition of the park as a public forum has — as suggested by the attendant image of the speaker on a soapbox — a very practical side to it as well: parks provide a free forum for those who cannot afford newspaper advertisements, television infomercials, or billboards." 33 F.3d at 1205. Government restrictions on the use of public places such as streets, sidewalks, and parks risk placing speech on topics of public importance within the purview of only the wealthy or those who enjoy the support of local authorities. *See id.* at 1205 n.8; *City of Richmond*, 743 F.2d

at 1356 (calling for careful examination of restrictions "when their effects fall unevenly on different . . . groups in society").

Section 5.60 requires a permit for "special events" on all public property within the City of Long Beach, including streets, sidewalks, and public parks. *See* LBMC § 5.60.020(A). "Special events" include parades, demonstrations, and assemblies of any size on public streets and sidewalks if they do not comply with applicable traffic regulations; organized assemblages of seventy-five or more people in public places; and other organized activities involving seventy-five or more persons involving the use of, or having an impact on, public property or facilities. LBMC § 5.60.010(I)(1)-(3); Long Beach Administrative Regulation ("AR") 8-28(IV)(A)(2) (2007). To the extent that the Ordinance regulates the use of public parks, sidewalks, and streets we analyze its provisions under the standard for traditional public fora.

### 3.   Regulation by Prior Restraint

Prior restraints on speech are disfavored and carry a "heavy presumption" of invalidity. *Forsyth County*, 505 U.S. at 130. "This heavy presumption is justified by the fact that 'prior restraints on speech . . . are the most serious and the least tolerable infringement on First Amendment rights.' " *Grossman*, 33 F.3d at 1204 (alteration in *Grossman*) (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1975)); *accord Rosen v. Port of Portland*, 641 F.2d 1243, 1246-47 (9th Cir. 1981). The Supreme Court explained in *Ward v. Rock Against Racism*, "[T]he regulations we have found invalid as prior restraints have 'had this in common: they gave public officials the power to deny use of a forum in advance of actual expression.' " 491 U.S. 781, 795 n.5 (1989) (quoting *Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 553 (1975)). *But see FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225-30 (1990) (invalidating as an impermissible prior restraint a licensing ordinance regulating the use of private property). A prior restraint need

not actually result in suppression of speech in order to be constitutionally invalid. "The relevant question [in determining whether something is a prior restraint] is whether the challenged regulation *authorizes* suppression of speech in advance of its expression . . . ." *Ward*, 491 U.S. at 795 n.5.

In *Grossman*, we noted that a permitting ordinance that required a written application before users could hold an organized demonstration in a public park did not fit entirely within "classic prior restraint cases." 33 F.3d at 1205 n.9 (internal quotation marks and citation omitted). But we held nevertheless that the permitting system still bore "a heavy presumption against its constitutional validity." *Id.* at 1204 (internal quotation marks omitted); *see also Forsyth County*, 505 U.S. at 130 (applying a " 'heavy presumption' " against validity of a regulation imposing advance fees on parades and assemblies held on public property because it was a "prior restraint" on speech). Section 5.60 is similar to the permitting system in *Grossman*, though it reaches a broader range of conduct. Section 5.60 regulates not only expressive activity in parks located in Long Beach, but also any activity on public streets, sidewalks, and right-of-ways. *See* LBMC § 5.60.010(I)(1). Section 5.60 even regulates events that "involve[ ] the use of, or ha[ve] an impact on, public property or facilities" if such activities are "likely to require the provision of [enumerated] city services." *Id.* § 5.60.010(I)(3); AR 8-28(IV)(A).

### B.   Reasonable Time, Place and Manner Restrictions

"[R]easonable time, place, [and] manner restrictions" on speech are permissible. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Such restrictions can include permitting requirements for core First Amendment speech in traditional public fora, *id.*, and they are permissible if they satisfy four criteria. As the Supreme Court wrote in *Clark*, "We have often noted that restrictions of this kind are valid provided [1] that they are justified without reference to the content of the regulated speech, [2] that they are narrowly

tailored to serve a significant governmental interest, and [3] that they leave open ample alternative channels for communication of the information." *Id.* (bracketed numbers added). In *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992), the Court recognized a fourth criterion: a permitting scheme "may not delegate overly broad licensing discretion to a government official."

The first criterion is that the restriction be content-neutral. That is, the restriction must be based on something other than the content of the speech. *Grace*, 461 U.S. at 177. A law is content-based rather than content-neutral if "the main purpose in enacting it was to suppress or exalt speech of a certain content, or it differentiates based on the content of speech on its face." *ACLU of Nevada v. City of Las Vegas*, 466 F.3d 784, 793 (9th Cir. 2006). Though "an improper censorial motive" is sufficient, such a motive is not necessary to render a regulation content-based. *Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd.*, 502 U.S. 105, 117 (1991). If a regulation "distinguish[es] favored speech from disfavored speech on the basis of the ideas or views expressed," it is content-based. *Foti v. City of Menlo Park*, 146 F.3d 629, 636 (9th Cir. 1998) (internal quotation marks omitted).

A content-based regulation is generally subject to strict scrutiny. The government therefore "must show that its regulation is necessary to serve a compelling state interest," *Perry Educ. Ass'n*, 460 U.S. at 45, and that the regulation uses "the least restrictive means to further the articulated interest," *Foti*, 146 F.3d at 636. "[A] *content-based* restriction on *political speech* in a *public forum* . . . must be subjected to the most exacting scrutiny." *Boos v. Barry*, 485 U.S. 312, 321 (1988).

Under the second criterion, the government must show: (1) that the governmental interest is substantial and "unrelated to suppression of expression," *Baldwin v. Redwood City*, 540 F.2d 1360, 1365 (9th Cir. 1976); and (2) that the regulation

is narrowly tailored to meet that interest, *Ward*, 491 U.S. at 797.

The first aspect is substantial governmental interest. The Supreme Court has recognized substantial governmental interests in regulating competing uses of public fora, *Forsyth County*, 505 U.S. at 130, in maintaining parks in an "attractive and intact condition," *Clark*, 468 U.S. at 296, in regulating "streets to protect and insure the safety, comfort, or convenience of the public," *Murdoch v. Pennsylvania*, 319 U.S. 105, 116 (1943), and in collecting nominal fees to "defray the expenses of policing" the regulated activity, *id.* at 113-14. We have also recognized as a substantial governmental interest the need to "provide notice to the municipality of the need for additional public safety and other services." *Food Not Bombs*, 450 F.3d at 1042. Although the public safety interests in regulating street use are substantial, "those interests must give way on occasion to the temporary dedication of the streets to picketing and parading." *ACORN*, 798 F.2d at 1267 n.5.

Three questions guide courts in analyzing narrow tailoring, the second aspect. First, does the regulation achieve its ends without restricting substantially more speech than necessary? This "requirement . . . is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' " *Ward*, 491 U.S. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)) (second alteration in *Ward*). The Supreme Court has cautioned that "this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* Expansive language can signal the absence of "a close fit with the governmental interests underlying the permitting requirement." *Food Not Bombs*, 450 F.3d at 1040-42 (comparing a restriction that applies if an activity "may" implicate a governmental

interest with a restriction that applies if the activity is "likely" to affect the interest). Second, are there obvious alternatives that would achieve the same objectives with less restriction of speech? A city is not required to select the least restrictive alternative, but "an assessment of alternatives can still bear on the reasonableness of the tailoring." *Menotti v. City of Seattle*, 409 F.3d 1113, 1131 n.31 (9th Cir. 2005); *see also City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993). Third, is a generic regulation needed "as applied to other speakers," even if it is not needed in the case at hand? *Galvin v. Hay*, 374 F.3d 739, 753 (9th Cir. 2004). This question addresses "[t]he multiplied effect of" a particular expressive activity "if many other organizations likewise decided to engage in this activity on a pervasive or regular basis." *ACORN*, 798 F.2d at 1270; *see also Clark*, 468 U.S. at 296-97.

The third criterion applicable to time, place and manner restrictions is that regulations "must leave open ample alternatives for communication." *Forsyth County*, 505 U.S. at 130. Several considerations are relevant to this analysis. First, "[a]n alternative is not ample if the speaker is not permitted to reach the intended audience." *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990) (internal quotation marks omitted); *see also Menotti*, 409 F.3d at 1138. Second, if the location of the expressive activity is part of the expressive message, alternative locations may not be adequate. *Galvin*, 374 F.3d at 756; *ACORN*, 798 F.2d at 1267 n.5. Third, we consider the opportunity for spontaneity in determining whether alternatives are ample, particularly for political speech. *City of Richmond*, 743 F.2d at 1356. Fourth, we consider the cost and convenience of alternatives. *City of Ladue v. Gilleo*, 512 U.S. 43, 57 (1994).

Finally, the fourth criterion is the prohibition on regulations that confer unbridled discretion on a permitting or licensing official. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969). Regulations must contain "narrow, objective,

and definite standards to guide the licensing authority," *id.*, and must require the official to "provide [an] explanation for his decision," *Forsyth County*, 505 U.S. at 133. The standards must be sufficient to "render [the official's decision] subject to effective judicial review." *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323 (2002). This requirement applies to an official's "authority to condition the permit on any additional terms" not stated in the ordinance. *City of Lakewood*, 486 U.S. at 772.

## V.    Analysis of § 5.60

### A.    Description of the Ordinance

**[4]** Section 5.60 requires groups to obtain city-issued permits in order to hold "special events" as defined in the Ordinance.[1] LBMC § 5.60.020(A). Permits for special events not involving expressive activity require at least sixty days advance notice to the City. By contrast, permits for special events involving expressive activity require between three and ten days advance notice, depending on the location of the planned event. *Id.* § 5.60.040. Certain events are exempt from the special event permit requirement. Those events include funeral processions; activities conducted by governmental agencies; filming activities governed by another provision of

---

[1]The City has asked us to take judicial notice of the Santa Monica ordinance and the City's recent amendment to § 5.60 concerning the definition of special events. We agree to take judicial notice of the Santa Monica ordinance. *See Food Not Bombs*, 450 F.3d at 1025 n.2 (citing *Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977)). We also agree to take judicial notice of the new definition of special events contained in subsection .010, as interpreted by Long Beach Administrative Regulation AR 8-28, promulgated on February 7, 2007. *Id.* at 1031-32; *see also City of Lakewood*, 486 U.S. at 770 (describing the requirements for an administrative regulation to affect constitutional analysis). As we stated in *Food Not Bombs*, "[w]e review only the present version of the ordinance and implementing regulations." 450 F.3d at 1025. We also note that in an order filed on January 23, 2007, this court granted the City's motion to take judicial notice of Chapter VII of the Chicago Park District Code.

the municipal code; and "spontaneous parades, assemblies or demonstrations involving expressive activity" occasioned by events coming into public knowledge within five days of the event. *Id.* § 5.60.030(A).

The City Manager "shall" grant a permit for a special event if certain criteria are satisfied. *Id.* § 5.60.040(J)(1)-(13). The City Manager "may" deny or revoke a permit if certain other criteria are satisfied. *Id.* § 5.60.070(A)(1)-(15), (B). A permittee must agree to hold harmless and indemnify the City and its officers and employees against a broad range of claims and harms, and must, under certain circumstances, obtain insurance. *Id*. § 5.60.080. A permittee must pay both a permit fee and "departmental services charges" to the City unless they are funded or waived by the City Council. *Id.* §§ 5.60.050, 5.60.090.

Departmental services charges are "the actual costs which a department of the city incurs in connection with activities for which a permit is required," including

> costs associated with fire safety, traffic and/or pedestrian control, water safety, the closure of streets or intersections, the diverting of traffic, the salaries of city personnel involved in administration or coordination of city services for the event, the cost to the city to provide support personnel, equipment, materials and supplies, and related city costs such as fringe benefits or employee overtime.

*Id.* § 5.60.010(C). Departmental services charges do not include "costs incurred by the city to provide police protection to those engaged in 'expressive activity.' " *Id.* However, other costs associated with expressive activities — beyond those associated with "police protection" — are included in departmental services charges.

"Spontaneous" events are exempt from the permitting requirement applicable to special events. An organizer of a

spontaneous event must provide at least twenty-four-hour advance notice to the City. *Id.* § 5.60.030(A)(5). The City Manager may impose "reasonable time, place and manner restrictions" on a spontaneous event. *Id.* § 5.60.030(B). Further, the City Manager may deny permission to hold a spontaneous event, based on the same criteria applicable to permits for special events. *Id.* §§ 5.60.030(C), 5.60.070. An organization holding a spontaneous event is not required to pay the permit application fee applicable to special events. *Id.* §§ 5.60.040(F), 5.60.030(A)(5). However, that organization may be required to pay departmental services charges unless those charges are funded or waived by the City Council.

The Peace Network challenges nine features of § 5.60, appearing in a number of subsections of the Ordinance. We first address five features that we hold are constitutional. We then address four features that we hold are unconstitutional in whole or in part.

### B. Constitutional Features of § 5.60

### 1. Expressive Activity Distinctions

The Peace Network argues that certain provisions distinguishing between "expressive activity" and other activity are impermissibly content-based because they provide for differential treatment of activities based on the messages those activities seek to convey.

[5] " 'Expressive Activity' means conduct, the sole or principal object of which is the expression, dissemination or communication by verbal, visual, literary or auditory means of opinion, views or ideas. Expressive activity includes, but is not limited to, public oratory and the distribution of literature." *Id.* § 5.60.010(D). It is true that some provisions of § 5.60 distinguish between expressive and non-expressive activity. *E.g.*, *id.* § 5.60.010(C) (prohibiting the City Manager from imposing departmental services charges for costs

incurred by the City to provide police protection to people engaged in expressive activity); *id.* § 5.60.020(D) (prohibiting the City Manager from imposing conditions on permits "in a manner that will unreasonably restrict expressive or other activity protected by the California or United States constitutions"); *id.* § 5.60.040(G) (requiring the City Manager to act on completed applications for permits involving expressive activities within two business days, to provide the applicant with written notice explaining the reasons for any denial or conditional approval, and to consult with the city attorney before denying or conditionally approving a permit involving expressive activity).

**[6]** However, we conclude that these distinctions between expressive activities and non-expressive activities are permissible. These subsections of § 5.60 are "justified without reference to the content of the regulated speech." *See Clark*, 468 U.S. at 293. These subsections do not show that the City has "adopted [the] regulation of speech because of disagreement with the message it conveys." *See Ward*, 491 U.S. at 791. Here, the opposite is true, for "the permissive nature of the [exceptions favoring expressive activity] furthers, rather than constricts, free speech." *See Thomas*, 534 U.S. at 325. All of the provisions "treat[ ] expressive events more favorably than others." *Food Not Bombs*, 450 F.3d at 1037; *cf. Burk v. Augusta-Richmond County*, 365 F.3d 1247, 1254-55 (11th Cir. 2004) (finding an ordinance restricting public gatherings to be unlawfully content-based because it was "directed only to communicative activity, rather than to all activity, and its applicability turn[ed] *solely* on the subject matter of what a speaker might say").

Further, the Ordinance does not "single[ ] out certain speech for differential treatment based on the idea expressed," *see ACLU of Nevada*, 466 F.3d at 794 (internal quotation marks omitted), and it does "not distinguish *among* the expressive events based on their content," *see Food Not Bombs*, 450 F.3d at 1037. Identifying "expressive activity"

protected by the First Amendment can sometimes be difficult. *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 399 (1989) (holding, in a 5-4 decision, that flag burning is protected activity under the First Amendment). But such difficulty arises from the nature of the constitutionally protected speech and the heightened protection provided by the First Amendment. *See, e.g.*, *Murdoch*, 319 U.S. at 115 ("A license tax certainly does not acquire constitutional validity because it classifies the privileges protected by the First Amendment along with the . . . merchandise of . . . peddlers and treats them all alike. Such equality in treatment does not save the ordinance. Freedom of . . . speech . . . [is] in a preferred position."). It does not follow that those subsections of § 5.60 that treat expressive activity more favorably than non-expressive activity are impermissibly content-based. Indeed, we recently held in *Food Not Bombs* that comparable provisions of Santa Monica's ordinance, distinguishing between "expressive" and "non-expressive" events, were permissible. 450 F.3d at 1037. Following *Food Not Bombs*, we so hold for these subsections of 5.60 as well.

### 2.    Conditions on Permits for Special Events

**[7]** The Peace Network argues that § 5.60.020(D) gives the City Manager unbridled discretion to impose conditions on permits to hold special events. We disagree. This subsection allows the City Manager to impose conditions on permits only to achieve specified purposes. It provides:

> The city manager may condition any permit . . . with *reasonable requirements* concerning the time, place or manner of holding such event *as is necessary to coordinate multiple uses of public property, assure preservation of public property and public places, prevent dangerous, unlawful or impermissible uses, protect the safety of persons and property and to control vehicular and pedestrian traffic in and around the venue*, provided that such requirements

shall not be imposed in a manner that will unreason-
ably restrict expressive or other activity protected by
the California or United States constitutions.

LBMC § 5.60.020(D) (emphasis added). The subsection then
goes on to provide a non-exhaustive list of conditions that the
City Manager may impose to achieve these specified pur-
poses. These conditions include "accommodation of an
event's pedestrian and vehicular traffic, including restricting
events to city sidewalks, portions of a city street, or other
public right-of-way," "provision of a waste management
plan, and the clean up and restoration of the site of the
event," and "reasonable designation of alternate sites, times,
dates, or modes for exercising expressive activity." *Id.*
§ 5.60.020(D)(2), (9), (13).

[8] The purposes specified in § 5.60.020(D) for imposing
conditions on permits are objective and relatively precise, and
have no discernable connection to the content of any particu-
lar message. *Compare City of Lakewood*, 486 U.S. at 753-54,
770 (striking down as allowing unbridled discretion a city
ordinance allowing the mayor to impose "any other terms and
conditions deemed necessary and reasonable" (internal quota-
tion marks omitted)), *with United States v. Linick*, 195 F.3d
538, 541 (9th Cir. 1999) (upholding a law allowing imposi-
tion of "terms and conditions as the authorized officer deems
necessary to . . . otherwise protect the public interest" (alter-
ation in original; internal quotation marks omitted)). Further,
the subsection authorizes only "reasonable requirements" that
are "necessary" to serve the specified purposes, and provides
that any such requirements must not "unreasonably restrict"
expressive activity. *See Menotti*, 409 F.3d at 1145 n.63; *S. Or.
Barter Fair*, 372 F.3d at 1139-41. We also note that
§ 5.60.040(G) requires the City Manager to consult with the
City Attorney and to provide to an applicant a written expla-
nation for a decision that imposes conditions on the permit.
*See* LBMC § 5.60.040(G). Finally, we note that
§§ 5.60.130(A) and .040(E) allow, in the alternative, a direct

appeal of a permitting decision to either the City Council or state court.

**[9]** We therefore conclude that § 5.60.020(D) does not confer "unbridled discretion" on the permitting authority to impose conditions in violation of the First Amendment. Although the provision has survived this facial challenge, it might nonetheless be vulnerable to an as-applied challenge if, in its implementation, there emerged "a pattern of unlawful favoritism," *see Thomas*, 534 U.S. at 324-25; *see, e.g., Shuttlesworth*, 394 U.S. at 156-59; *Cox v. New Hampshire*, 312 U.S. 569, 575-77 (1941), or if it resulted in an impermissibly burdensome time, place or manner restriction, *see, e.g., Galvin*, 374 F.3d at 747 n.5, 752-56; *One World One Family Now v. City & County of Honolulu*, 76 F.3d 1009, 1012 (9th Cir. 1996).

### 3.    Proof of Indigent Status

The Peace Network also challenges as allowing unbridled discretion § 5.60.050(B), which allows the City Manager to require "relevant information and documentation as may, in the opinion of the city manager or his/her designee, be reasonably necessary to verify" the indigent status of a person.[2] The validity of § 5.60.090(E), which imposes departmental services charges on a permittee unless he or she qualifies as an "indigent natural person," depends in part on the constitutionality of subsection .050(B). LBMC §§ 5.60.050(B), .090(E).

**[10]** Section 5.60.050(B) defines an "indigent natural person" to include any person who is "eligible for county relief and support" under the California Welfare and Institutions

---

[2]The Peace Network's other challenge to § 5.60.050 addresses the provision that a permit applicant must pay a fee that is established by the City Council through a resolution unless the City Council waives the fee. We address the waiver provision in Part V.C.4, *infra*, regarding fees and departmental services charges.

Code, but the definition "is not limited to" such persons. *Id.* § 5.60.050(B). An indigent natural person who desires to engage in expressive activity may request a waiver of the permit application fee imposed by subsection .050.[3] *Id.* We conclude that the eligibility provision does not confer unbridled discretion on the City Manager.

[11] First, the definition of indigency based on the California Welfare and Institutions Code is content-neutral and objective. Section 5.60.050(B) allows the City Manager to determine which "relevant information and documentation" is "reasonably necessary to verify [indigency] status." *Id.* § 5.60.050(B). But the documentation requirements do not affect the definition of indigency. Rather, they merely give flexibility to the City Manager in determining whether a particular applicant has satisfied the criteria of the definition. We do not regard this flexibility as providing the sort of unbridled discretion that would invalidate the section. A person's indigent status is not always readily ascertainable. Proof of such status may come in many forms, depending on the circumstances of the applicant. Coupled with this array of potential forms of proof is the City's interest in verifying that an applicant requesting a fee waiver is indeed indigent. The Ordinance, which limits the City to "relevant information" that is "reasonably necessary," adequately ensures that the choice of means of proof is not left to the "whim" of the City Manager. *Id.* § 5.60.050(B); *cf. S. Or. Barter Fair*, 372 F.3d at 1139.

Requiring additional limitations governing the type of documentation the City Manager may request as proof of indigency would be, in the words of Justice Scalia, "insisting

---

[3]The term "indigent natural person" is used in the same fashion in LBMC § 5.60.090(E). That section imposes departmental services charges on permittees unless they qualify as an "indigent natural person." *See* LBMC § 5.60.090(E). We reach the same conclusion under that provision as we do here: The City Manager's ability to request "relevant information and documentation" to prove indigent status does not give the public official unbridled discretion.

upon a degree of rigidity that is found in few legal arrangements." *See Thomas*, 534 U.S. at 325. Moreover, the indigency provisions are designed to "further[ ], rather than constrict[ ], free speech," *see id.*, and therefore should be construed favorably in the absence of evidence of a pattern of abuse.

**[12]** The Peace Network makes a related challenge to the indigency exception, contending that the definition of indigent natural person, which "is not limited to" a person eligible for county relief, vests the City Manager with unbridled discretion to decide who else may qualify for the exemption. We disagree. Indigency is a common term with a well understood definition. One may disagree, within certain limits, about the level of income or assets needed to qualify as an indigent under the Ordinance, but the disagreement will be in a fairly narrow range. Further, the Ordinance has given a baseline in specifying that persons "eligible for county relief" qualify as indigent. We therefore conclude that the definition of indigent natural person does not confer unbridled discretion. Like the documentary provisions, the expansive definition is designed to further, rather than to restrict, free speech and therefore should be construed favorably.

We also note that if the application is denied, the City Manager must provide the applicant with a statement explaining the reasons for denial. LBMC § 5.60.070(C). The applicant has the opportunity to appeal the denial to the City Council, *id.* § 5.60.130(A), or, if the applicant has applied for a special event permit fewer than thirty days before the event, directly to state court, *id.* § 5.60.040(E). For these reasons, the proof of indigency provision does not give the City Manager unbridled discretion in violation of the First Amendment.

### 4.    Insurance Requirement

Section 5.60.080(B) provides that permittees must "procure and maintain [an insurance policy] in full force and effect dur-

ing the term of the permit." The Peace Network argues that this provision is content-based and allows public officials to exercise unbridled discretion. We disagree.

Section 5.60.080(C) authorizes the City Manager to waive the insurance requirement if he determines that the planned event does not present a "substantial or significant public liability or property damage exposure for the city or its officers[.]" Further, § 5.60.080(D) provides an exception to the insurance requirement, stating that it "shall not be construed to apply to parades or special events . . . involving expressive activity which enjoy protection under the United States or California constitutions[.]" To qualify for this exception, such

> parades or special events shall be required to either: (1) agree to indemnify, protect, defend and hold harmless the city, its officers and employees against all claims, damages, expenses, loss or liability of any kind or nature whatsoever arising out of, or resulting from, the alleged acts or omissions of permittee, its officers, agents or employees in connection with the permitted parade, event or activity; or (2) agree to redesign or reschedule the permitted event to respond to specific risks, hazards and dangers to the public health and safety identified by the city manager as being reasonably foreseeable consequences of the permitted parade or special event[.]

*Id.*

In *Food Not Bombs*, we examined Santa Monica's similar insurance requirement. 450 F.3d at 1056-57 (Kleinfeld, J., writing for the majority); *id.* at 1049-52 (Berzon, J., dissenting in part). The Santa Monica ordinance required permittees to obtain insurance "that the Risk Manager determines to be necessary and adequate under the circumstances" for demonstrations and parades. *Id.* at 1028 (Berzon, J., maj. op.) (internal quotation marks omitted). The ordinance exempted

expressive events from the insurance requirement, so long as
the organizers indemnified the city, "unless there is a specific,
demonstrable history of personal injury or property damage
claims being awarded against the applicant attributable to the
applicant's conduct of previous events in the City that are
similar in nature to the proposed event." *Id.* (internal quota-
tion marks omitted).

The majority of the panel upheld the insurance require-
ment, concluding that it was content-neutral. *Id.* at 1057
(Kleinfeld, J., writing for the majority). Judge Berzon, writing
for herself, would have struck down the requirement as
content-based. *Id.* at 1051-52 (Berzon, J., dissenting in part).
The majority observed that

> [p]olitical demonstration organizers can . . . avoid
> . . . the insurance provision if they cooperate with the
> City Manager to design the event "to respond to spe-
> cific risks, hazards and dangers to the public health
> and safety identified by the City Manager . . . as
> being reasonably foreseeable consequences of the
> permitted event." Thus, most demonstration organiz-
> ers will not have to provide insurance and even those
> with a destructive history can avoid the insurance
> requirement if they choose to work with the City
> Manager to avoid repetition of past injuries or prop-
> erty damage.

*Id.* at 1057 (footnote and citation omitted).

**[13]** The Peace Network argues that by authorizing the
Long Beach City Manager to determine whether insurance is
required, the Ordinance requires the City Manager to evaluate
the content of the message that is conveyed. While we con-
clude below that the indemnification provision in
§ 5.60.080(A), which applies to "[e]ach permit," is invalid in
the sense that the City may not require a permit applicant to
provide indemnification, we conclude that a city may autho-

rize a permit applicant to provide, at the applicant's option, indemnification as an alternative to insurance. Moreover, Long Beach leaves permit applicants with another alternative if they wish to hold their planned event — they may redesign the event. We see nothing to distinguish the LBMC insurance requirement from the insurance requirement we upheld as content-neutral in *Food Not Bombs*. The redesign language in § 5.60.080(D) is nearly identical to the language of the alternative evaluated in *Food Not Bombs*. Therefore, because a "valid . . . alternative" exists, "the insurance provision . . . present[s] no constitutional problem." *Food Not Bombs*, 450 F.3d at 1049-50; *cf. id.* at 1049-50 (Berzon, J., dissenting in part) (stating that with a valid indemnification alternative the insurance provision at issue "would present no constitutional problem").

The Peace Network also argues that § 5.60.080(D) gives the City Manager unbridled discretion to impose or waive insurance requirements. However, the subsection states that the insurance provision "shall not be construed to apply" to expressive activities that qualify for the exemption. The words "shall not" do not connote discretion to require insurance for parades and special events involving expressive activities. If the availability of the exemption is triggered because the event involves expressive activity, there are three alternatives: indemnification (which we hold invalid), redesign of the event, or insurance. The Ordinance does not specify who selects between these available options. *See* LBMC § 5.60.080(D). The commonsense reading of this subsection is that the applicant seeking to hold a parade or special event that involves expressive activity may select between the alternatives.

Section 5.60.080(C) is a logical extension of the second alternative in subsection (D). If there is no need to redesign or reschedule an expressive event because it poses no substantial risk of public liability or property damage, then the City Manager can waive the insurance requirement altogether. We

read the mandatory language of subsection (D) in conjunction with the permissive language of subsection (C) to require the City Manager to waive the insurance requirement if the event does not present a substantial risk of public liability or property damage, thereby obviating any need to redesign or reschedule the event. It would be absurd to require the City Manager to propose that the event be redesigned or rescheduled in situations where the change is not necessary because the event poses minimal risks of public liability in the first place. Based on this commonsensical reading of the statute, we conclude that the insurance waiver provision provides the City Manager with content-neutral, objective factors which control and direct the City Manager's decision whether to grant a waiver.

**[14]** We recognize that the Ordinance does not, in terms, require the City Manager to provide an explanation for the decision not to waive the insurance requirement. *See Forsyth County*, 505 U.S. at 133. However, it does require the City Manager to identify the "specific risks, hazards and dangers to the public health and safety" and to propose that the organizers "redesign or reschedule" the event in response to those risks. LBMC § 5.60.080(D). This communication constitutes a sufficient explanation of the City Manager's decision. We also recognize that the Ordinance allows "any person aggrieved by the issuance, denial, or revocation of a permit" to appeal the decision to the City Council to obtain a final determination, which may then be appealed in state court. *Id.* § 5.60.080(A); *see id.* § 5.60.040(E). The Ordinance does not prohibit event organizers from using these methods of review to challenge conditions imposed on permits. *See id.* § 5.60.080(A); *see also City of Lakewood*, 486 U.S. at 772 (applying the unbridled discretion requirements to an official's "authority to condition the permit on any additional terms"). For these reasons, the Ordinance does not afford the City Manager unbridled discretion to exempt an applicant from the insurance requirement.

5.    Criminal Liability for Violation of the Ordinance

**[15]** The Peace Network contends that the Ordinance is unconstitutional because it authorizes criminal liability for unknowing violations of its provisions. According to the Peace Network, the Ordinance "imposes strict liability on anyone who participates or engages in, or permits another to conduct a special event." The Peace Network has misread the Ordinance. Section 5.60.120 authorizes a misdemeanor penalty, but does so only for a "person who intentionally violates any of the provisions of" § 5.60. LBMC § 5.60.120. To the degree that the Ordinance is otherwise constitutional, a misdemeanor penalty for intentional violation of its provisions does not violate the First Amendment.

C.    Unconstitutional Features of § 5.60

1.    "Special" Events

**[16]** A "special event," as defined by the Ordinance, requires a permit issued by the City Manager. There are three categories of special events under the Ordinance. The Peace Network argues that requiring a permit for the second and third categories is unconstitutional. We disagree with its arguments as to the second category, but agree with its argument as to the third category.

A special event requires a permit if it is conducted "in, on or upon any city street, sidewalk, alley, park, way, pier, public place, public property or public right-of-way which is owned or controlled by the city." *Id.* at § 5.60.020(A). The Ordinance defines "special event" as:

> 1.    Any organized formation, parade, procession, demonstration or assembly which may include persons, animals, vehicles, or any combination thereof, which is to assemble or travel in unison on any street, sidewalk or other public right-of-way owned

or controlled by the city which does not comply with applicable traffic regulations, laws or controls; or

2.   Any organized assemblage of seventy five (75) or more persons at any public place, property or facility which is to gather for a common purpose under the direction or control of a person; or

3.   Any other organized activity involving seventy five (75) or more persons conducted by a person for a common or collective use, purpose, or benefit which involves the use of, or has an impact on, public property or facilities and which may require the provision of city public services in response thereto.

*Id.* § 5.60.010(I)(1)-(3). The City recently promulgated a regulation limiting the third category to activities that are "likely to require the provision of city services" for six specified purposes: "street blockage," "erecting barriers," "construction," "traffic control," "crowd control," or "litter abatement (for amounts in excess of that normally expected for the public property or facilities involved)." AR 8-28(IV)(A)(1)-(2).

The Peace Network first argues that because the term "common purpose" in the second category of special event is not defined, "[t]he determination of whether a group is assembled for a 'common purpose' is, necessarily, a content-based judgment." We disagree.

The "common purpose" language in the second category can be "justified without reference to the content of the regulated speech," *Clark*, 468 U.S. at 293, because the provision applies regardless of whether the people are engaged in an expressive activity and because it furthers the City's interest in receiving advance notice when large groups are planning to assemble so that it may regulate competing uses — a justification unrelated to the content of speech. *See Food Not Bombs*, 450 F.3d at 1042. The language of the category applies when

the "organized assemblage" is planning "to gather for a common purpose *under the direction or control of a person*." LBMC § 5.60.010(I)(2) (emphasis added). Without the common purpose limitation, seventy-five people who happened to be in a park at the same time and who assembled in an organized manner in response to police instructions to move to a different part of the park would require a permit to do so.

The Peace Network next argues that because the second special event category requires a permit for any "organized assemblage" of seventy-five or more people at any public place, without specifying any adverse impact on any substantial governmental interest, it fails the narrow tailoring requirement. *See* LBMC § 5.60.010(I)(1)-(3). We disagree.

The second category encompasses only events that take place "at any public place, property or facility." *Id.* § 5.60.010(I)(2). Such public places include public open spaces, where we have held that the substantial governmental interests are "only to regulate competing uses and provide notice to the municipality of the need for additional public safety and other services." *Food Not Bombs*, 450 F.3d at 1042. We recognized in *Food Not Bombs* that those governmental interests are significant, holding that "[g]roups of 150 or more, whether demonstrating or playing soccer, are by any measure sufficiently large enough to affect or have an impact on the use of [the City's] public spaces by other citizens and therefore to implicate the City's interest in maintaining the safe and compatible use of limited public open space." *Id.* at 1043 (internal quotation marks omitted). We cautioned, however, that "a substantially lower number may well not comport comfortably with the limited governmental interests at play in public parks and open spaces." *Id.* at 1043 n.17.

**[17]** The second category of special event applies to groups of seventy-five or more people conducting activities "at any public place, property or facility," exactly half the number we upheld in *Food Not Bombs*. LBMC § 5.60.010(I)(2); *see* 450

F.3d at 1042-43. The Supreme Court has recognized a government's significant interest in managing competing uses when large groups of people intend to use public property. *See Thomas*, 534 U.S. at 322. Although it is a close question, we hold that a group of seventy-five people using a public open space in Long Beach is large enough to warrant an advance notice and permitting requirement. *See Grossman*, 33 F.3d at 1206. Advance notice and permitting requirements applicable to smaller groups would likely be unconstitutional, unless such uses implicated other significant governmental interests, or where the public space in question was so small that even a relatively small number of people could pose a problem of regulating competing uses. Similarly, advance notice and permitting requirements for the use of much larger open spaces than those regulated by the LBMC might be unconstitutional even for groups of seventy-five. Because we hold that the second category is narrowly tailored in public open spaces, it is necessarily narrowly tailored in other public spaces such as sidewalks and streets, where the governmental interests are stronger. *See Food Not Bombs*, 450 F.3d at 1039 ("[T]he significant governmental interest justifying the unusual step of requiring citizens to inform the government in advance of expressive activity has always been understood to arise only when large groups of people travel together on streets and sidewalks."). *Compare* LBMC § 5.60.010(I)(1) (requiring a permit for groups of any size using sidewalks and streets when the use "does not comply with applicable traffic regulations"), *with id.* § 5.60.010(I)(2) (requiring a permit for groups of seventy-five or more persons "at any public place, property, or facility").

Finally, the Peace Network argues that the third category of special event is not narrowly tailored to serve a substantial governmental interest. We agree.

The distinction between the second category of "special event," defined as "[a]ny organized assemblage of seventy five (75) or more persons at any public place" and the third

category of "special event," defined as "[a]ny other organized activity involving seventy five (75) or more persons" in a public place is discernible, but only with some effort. As we construe the Ordinance, an "organized activity" in a public place is not necessarily an "organized assemblage." For example, a group might organize a "5K Fun Run" in which fifty people race. Course monitors, first aid personnel, and spectators might be stationed along the course. This "organized activity" could easily "involv[e] seventy five (75) or more persons" and would be "conducted . . . for a common or collective . . . purpose." LBMC § 5.60.010(I)(3). Yet if the runners, spectators, course monitors, and first aid personnel never gather together in one place, it is possible that this event might never amount to an "organized assemblage of seventy five (75) or more persons." *Id.* § 5.60.010(I)(2).

It is unclear to us whether the third category is confined to events in public places. If it is not so confined, an advance permitting requirement cannot be justified, as it can be for the second category, on the ground of regulating competing uses in such places. But even if the third category is confined to events in public places, it is still not narrowly tailored.

**[18]** The critical qualifying criterion for inclusion in the third category is that the event "may require the provision of city public services in response thereto." LBMC § 5.60.010(I)(3). If we look only to the text of the Ordinance, the possibility of requiring the provision of any city public service — no matter how trivial the service — is enough to qualify the event for inclusion in the third category. As indicated above, the City has recently promulgated a regulation in an attempt to narrow the definition of city public services under the third category. The six services listed in the new regulation — any one of which would qualify the event as a special event requiring an advance permit — are "street blockage," "erecting barriers," "construction," "traffic control," "crowd control," or "litter abatement." We hold that this regulation has not sufficiently narrowed the definition of city

public services that may be required by an expressive event to satisfy the narrow tailoring requirement.

In *Food Not Bombs*, we upheld an ordinance that required a permit for any "march, procession, walk, run or assembly on public sidewalks or City park paths" that was "likely to [ ] interfere with the free use of any public way . . . or not comply with traffic regulations." 450 F.3d at 1038-39 (internal quotation marks omitted; second alteration in *Food Not Bombs*; emphasis removed). That is, we held that the permitting requirement was valid to the extent that the event was likely to interfere with the use of public ways or to violate traffic regulations. We think it is also safe to say that a permitting requirement would be valid to the extent that the event was likely to pose a threat to public safety.

But the third category, described in § 5.60.010(I)(3), even as modified by the recent regulation, includes events that may require nothing more than city public services to deal with litter. The City has offered no argument that litter abatement is a substantial governmental interest. In *Schneider v. New Jersey*, the Supreme Court held that legislation enacted to further the governmental interest in

> keep[ing] the streets clean and of good appearance is insufficient to justify an ordinance which prohibits a person rightfully on a public street from handing literature to one willing to receive it. Any burden imposed upon the city authorities in cleaning and caring for the streets as an indirect consequence of such distribution results from the constitutional protection of the freedom of speech[.]

308 U.S. 147, 162 (1939). Unlike the government's interest in regulating competing uses of park space, preserving free use of public ways, enforcing traffic rules or ensuring public safety, the government's interest in litter abatement is not suf-

ficient to justify a prior restraint on an expressive activity through a permitting requirement.

Three of the other specified city public services are clearly related to free use of public ways, traffic violations or public safety, and would thus be permissible bases for requiring advance permits: "street blockage," "erecting barriers," and "traffic control." The two remaining city public services are less clearly related to substantial governmental interests — "construction" and "crowd control." These two services *could be* sufficiently related, depending on the type and purpose of the construction and crowd control, but a more precise definition would be needed before we could conclude that they were.

The government has the burden of showing that a restriction is narrowly tailored. *Bay Area Peace Navy*, 914 F.2d at 1227. We conclude that the City has failed to carry its burden to show that the definition of the third category of special event, described in § 5.60.010(I)(3) and the accompanying administrative regulation, is narrowly tailored to serve a significant governmental interest.

## 2.   "Spontaneous" Events

"Spontaneous" events are defined as "parades, assemblies or demonstrations involving expressive activity and which are occasioned by news or affairs coming into public knowledge within five (5) days of such parade, assembly or demonstration." LBMC § 5.60.030(A)(5). The Peace Network argues that the provisions governing "spontaneous" events are not narrowly tailored and do not provide sufficient alternative means of communication.[4] We agree.

---

[4]The Peace Network does not challenge the notice requirements for non-spontaneous events. *Cf. Food Not Bombs*, 450 F.3d at 1043-45.

Spontaneous events are not subject to the permitting requirements applicable to "special" events. *Id.* However, organizers who wish to hold spontaneous events are required to "give written notice to the city manager at least twenty four (24) hours prior to such parade or assembly." *Id.* The twenty-four-hour advance notice requirement for spontaneous events is less demanding than the three-, five- or ten-day notice requirements for "special" events involving expressive activity. LBMC § 5.60.040(D) (requiring three-day advance notice for events held on "sidewalks," "parks," or "waterways and piers," five-day notice for "alleys and other rights-of-way other than sidewalks," and ten-day notice for "streets, highways and thoroughfares").

The City Manager may impose "reasonable time, place and manner restrictions" on a spontaneous event. *Id.* § 5.60.030(B). Further, the City Manager may deny permission to hold a spontaneous event based on the same criteria applicable to a special event. *Id.* § 5.60.030(C). Such criteria include, *inter alia*, unreasonable disruption of traffic, unreasonable interference with access to police or fire stations, and undue hardship to adjacent businesses or residents. *Id.* § 5.60.070(A).

Courts have considered several factors in determining the validity of requirements applicable to expressive activity in response to late-breaking news or to issues of immediate or urgent concern. These factors include the ability of individuals to respond quickly to events or issues of concern, the scope of the regulation, and available alternative means of expression. *See Food Not Bombs*, 450 F.3d at 1046-47. We consider these factors in turn.

First, as just noted, the Ordinance requires groups to give the City at least twenty-four-hours advance notice before holding a "spontaneous" event. The Supreme Court has observed that "timing is of the essence in politics . . . . [W]hen an event occurs, it is often necessary to have one's voice

heard promptly, if it is to be considered at all." *Shuttlesworth*, 394 U.S. at 163. "[T]he change in timing [imposed by an advance notice requirement] will alter the potential impact of [the participants'] speech. For speech that is truly time sensitive, the precise spontaneous moment will be lost." *Food Not Bombs*, 450 F.3d at 1046. "By requiring advance notice, the government outlaws spontaneous expression. Immediate speech can no longer respond to immediate issues." *City of Richmond*, 743 F.2d at 1355; *cf. Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1008 (9th Cir. 2003) ("To suggest that the [twenty-four-hour] waiting period is minimal ignores the reality of breakneck political campaigning and the importance of getting the message out in a timely, or, in some cases, even instantaneous fashion."). A twenty-four-hour advance notice requirement for a spontaneous event is not categorically unconstitutional. But it may be so, depending on factors such as the definition of a spontaneous event and the availability of alternative means of expression.

Second, a spontaneous event includes all "[s]pontaneous parades, assemblies, or demonstrations involving expressive activity" occasioned by "news or affairs coming into public knowledge withing five (5) days of such parade, assembly or demonstration[.]" LBMC § 5.60.030(A)(5). That is, a spontaneous event would be a "special event" requiring a formal permit were it not for the time-sensitivity of the event. A "demonstration" is separately defined in the Ordinance as "any formation, procession or assembly of persons for the purpose of expressive activity, who intend to or do assemble or travel in unison on any street, sidewalk or other public right-of-way owned or controlled by the city in a manner that does not comply with normal or usual traffic regulations, laws or controls." *Id.* § 5.60.010(B). However, "parade" and "assembly" are not separately defined. We may reasonably assume, even without a separate definition, that a "parade" is a procession that takes place on a public street or other public right-of-way.

But the definition of an "assembly" that constitutes a spontaneous event is not so obvious. The definition of a "special event" requiring a permit includes "[a]ny organized assemblage of seventy five (75) or more persons in any public place, property or facility which is to gather for a common purpose under the direction or control of a person."[5] Because a spontaneous event is the same thing as a special event but for its time sensitivity, we take the definition of "assembly" to be at least as broad as "organized assemblage." The definition of "assembly" may well be broader, but for present purposes that does not matter, for the definition of organized assemblage includes assemblies that take place on the lawn in front of a city hall, in a public park, on a publicly owned soccer field, or possibly even on a privately owned but publicly accessible open space. Thus, the spontaneous event regulation — and the twenty-four-hour advance notice requirement — apply to assemblies in places where there is no threat of disruption of the flow of pedestrian or vehicular traffic.

Third, alternative means of expression are limited for people who cannot comply, or who could comply only with difficulty, with the twenty-four-hour advance notice requirement. We wrote in *Food Not Bombs*, "[T]o comport with the First Amendment, a permitting ordinance must provide some alternative for expression concerning fast-breaking events." 450 F.3d at 1047. Therefore, we "consider . . . whether the [LBMC] advance notice requirement, including the spontaneous expression exception, overall provides adequate alternatives for expression, both planned and spontaneous." *Id.* at

---

[5] The definition of a special event also includes "[a]ny other organized activity involving seventy five (75) or more persons conducted by a person for a common or collective use, purpose or benefit which involves the use of, or has an impact on, public property or facilities and which may require the provision of city or public services in response thereto." We hold that this definition of special event is unconstitutional because it is not narrowly tailored. *See supra* Part IV.C.1. We do not rely on this definition for purposes of determining the definition of "assembly," as that term is used in defining a spontaneous event.

1046; *see also Ctr. for Fair Pub. Policy v. Maricopa County*, 336 F.3d 1153, 1170 (9th Cir. 2003) ("The Supreme Court generally will not strike down a governmental action for failure to leave open ample alternative channels of communication unless the government enactment will foreclose an entire medium of public expression across the landscape of a particular community or setting." (citation and internal quotation marks omitted).

**[19]** We conclude that the regulation of "spontaneous" events under the Ordinance is not narrowly tailored to regulate only events in which there is a substantial governmental interest in requiring such advance notice. The regulation requires twenty-four-hour advance notice irrespective of whether there is any possibility that the event will interfere with traffic flow. Further, the regulation fails to provide ample alternative means of communication for people wishing to participate in spontaneous expressive events.

The regulation of spontaneous events under the Ordinance stands in stark contrast to the Santa Monica spontaneous event regulation that we recently upheld in *Food Not Bombs*. There, "with respect to time-sensitive speech," large groups had three alternatives to providing notice before such an event. First, the City Hall lawn was open to any group wishing to engage in speech. *Food Not Bombs*, 450 F.3d at 1048. Second, a "safe harbor provision" described formations for sidewalk marches that would not require a permit and that would be available for "groups as large as 1,999." *Id.* Third, the ordinance explicitly exempted "unorganized" gatherings from the provisions. *Id.* at 1049; *see City of Richmond*, 743 F.2d. at 1355-56 ("[T]he delay inherent in advance notice requirements inhibits speech. By requiring advance notice, the government outlaws spontaneous expression. Immediate speech can no longer respond to immediate issues. The quantity of effective speech is limited.").

### 3.    Hold-harmless and Indemnification Clauses

The Ordinance contains a broadly worded clause under which a permittee is required to agree to hold harmless and indemnify the City for harm arising out of the permitted activity. LBMC § 5.60.080(A). The permit application form contains an even more broadly worded clause. These requirements apply to "[e]ach permit" and differ from the indemnification alternative to insurance set forth in § 5.60.080(D). The Peace Network argues that these clauses are unconstitutional because they are not narrowly tailored to serve a significant governmental interest. We agree.

The hold-harmless and indemnity clause of the Ordinance provides, in relevant part:

> Each permit shall expressly provide that the permittee agrees to defend, protect, indemnify and hold the city, its officers, employees and agents free and harmless from and against any and all claims, damages, expenses, loss or liability of any kind or nature whatsoever arising out of, or resulting from, the alleged acts or omissions of permittee, its officers, agents or employees in connection with the permitted event or activity[.]

LBMC § 5.60.080(A). The permit application form requires not only that permittees agree to hold harmless and indemnify the City for expenses resulting from "acts or omissions" of the "permittee, its officers, agents or employees." It also requires that permittees agree that their "organization will hold the City harmless from *any liability caused by the conduct of the event*." (Emphasis added.) It states that "[t]he City will not be liable for any mishaps or injuries associated with the event," and goes on to provide that "[f]ull responsibility for activities at the event will be assumed by the organization."

We evaluate not only the text of the Ordinance, but also the manner in which it has been implemented by governing

authority. *See Ward*, 491 U.S. at 795-96 (including the administrative implementation of a challenged provision in the Court's constitutional analysis); *cf. Forsyth County*, 505 U.S. at 131 n.9 (examining the language of a permit application form to determine how the local government interpreted an ordinance provision). The terms "hold-harmless clause" and "indemnity clause" often refer to the same thing — an agreement under which "one party agrees to answer for any . . . *liability* or *harm* that the other party might incur." *Black's Law Dictionary* 784 (8th ed. 2004) (defining "indemnity clause," noting that the clause is "[a]lso termed *hold-harmless clause; save-harmless clause*" (emphasis in original)).

Another provision of the Ordinance provides that "departmental services charges" may be assessed against a permittee, except that such charges may not include a charge for police protection of the permittees. LBMC § 5.60.010(C); *see Forsyth*, 505 U.S. at 133-36; *Food Not Bombs*, 450 F.3d at 1049. The Peace Network has not challenged the assessment of departmental services charges except (as we discuss in the next section) to the extent that the City Manager has unbridled discretion to decide whether such charges will be assessed in a particular case. For purposes of our analysis of the hold-harmless and indemnity clauses, we assume that the assessment of departmental services charges, as those charges are defined in the Ordinance, is permissible. The question before us, therefore, is whether the City may require the permittees to hold harmless and indemnify the City for the remaining costs specified in the clauses.

The clauses, taken together, require permittees (1) to agree to compensate the City for any "damages, expenses, loss or liability . . . arising out of or resulting from the alleged actions or omissions" of permittees; (2) to agree to hold the City harmless for "any liability caused by the conduct of the event" to permittees; and (3) to agree to reimburse the City for "any liability caused by the conduct of the event" to third parties. The phrase "any liability caused by the conduct of the event"

is susceptible to a broad reading, encompassing liability caused by the acts or omissions of any person or entity involved in the event, including acts and omissions not only of the permittees but also of the City and third parties.

[20] We conclude that the clauses are not narrowly tailored to serve a substantial governmental interest. In performing our narrow tailoring analysis, we ask whether the clauses serve a substantial governmental interest without restricting substantially more speech than necessary, and whether there are obvious alternatives that would achieve the same objectives while restricting less speech. We hold that the clauses are not narrowly tailored in three respects.

[21] First, the clauses require that the permittees compensate the City for any "damages, expenses, loss or liability . . . arising out of . . . the alleged acts or omissions of permittee." LBMC § 5.60.080(A). The permit application further requires permittees to indemnify the City for any "mishaps or injuries," intentional or otherwise, that are "associated with the event." It is well established that governments may not "recoup costs that are related to listeners' reaction" to speech. *Forsyth County*, 505 U.S. at 135 n.12. The Supreme Court explained in *Forsyth County* that recouping such costs is unconstitutional because "[s]peech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob." *Id.* at 134-35. The Ordinance specifically provides that the cost of providing police protection is excluded from "departmental services charges," *see* LBMC § 5.60.010(C), but the clauses would require permittees to compensate the City for more than just "departmental services charges." The indemnification and hold-harmless clauses contain no exclusion for losses to the City occasioned by the reaction to the permittees' expressive activity. The clauses thus allow the City impermissibly to shift some of the costs related to listeners' reactions to speech from the City to the permittees.

**[22]** Second, the clause contained in the permit application requires that permittees hold the City harmless for "any liability caused by the conduct of the event" — including, under a broad reading of this language, liability of the City to the permittees. That is, the clause requires that the permittees agree, as a condition of obtaining a permit to engage in expressive speech, to forgo recovery on any cause of action they might otherwise have against the City. The clause encompasses not only liability for physical harm to the permittees, but also for deprivation of permittees' constitutional rights. *Compare generally Orin v. Barclay*, 272 F.3d 1207, 1216 (9th Cir. 2001) (holding in a § 1983 action that state officials were not entitled to qualified immunity for limiting the message of a speaker who was protected by First Amendment). We think it obvious that permittees cannot be required to waive their right to hold the City liable for its otherwise actionable conduct as a condition of exercising their right to free speech.

**[23]** Third, the clause in the permit application requires that permittees hold the City harmless for "any liability caused by the conduct of the event" to third parties. The permit application requires permittees to take "[f]ull responsibility for activities at the event." The provision requires permittees to assume legal and financial responsibility even for those "activities at the event" that are outside the control of the permittee, indeed including activities of the City. In *NAACP v. Claiborne Hardware Co.*, the Supreme Court reviewed the damages awards from a civil rights boycott in Mississippi and explained that liability for costs arising out of protected expressive activity is limited by the amount of control the speaker exerts over the actors and the message of the speech. 458 U.S. at 916-20. The Court held that "the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages," *id.* at 916-17, and declined to impose liability "merely because an individual belonged to a group, some members of which committed acts of violence." *Id.* at 920. The Court

wrote that "[f]or liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims" because " '[i]n this sensitive field, the State may not employ "means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." ' " *Id.* (quoting *Carroll v. Princess Anne*, 393 U.S. 175, 183-84 (1968)). Requiring permittees to compensate third parties for harm caused by hecklers, counter-protesters, or other persons not part of permittees' organization restricts substantially more speech than the liability found unconstitutional in *Claiborne Hardware*. *See* 458 U.S. at 916-17, 918-19. Similarly, requiring permittees to compensate third parties for harm caused by acts and omissions of the City impermissibly restricts speech.

The City argues that the clauses should be upheld because we did not strike down similar provisions in *Food Not Bombs*. For two reasons, we disagree. First, the clauses in this case are broader than the provisions upheld in *Food Not Bombs*. *See* 450 F.3d at 1056 (Kleinfeld, J., writing for the majority). In that case, Santa Monica had imposed a hold-harmless provision that was limited to "all claims, damages, expenses, [and] loss or liability" resulting from "alleged willful or negligent acts or omissions of permittee, its officers, agents, or employees in connection with the permitted event or activity." *Id.* at 1056 n.10 (internal quotation marks omitted).

Second, although we did not address the issue of narrow tailoring in *Food Not Bombs* because plaintiffs had challenged the provision only on the ground that it was content-based, *id.* at 1058 (Wardlaw, J., concurring), our conclusion in this case is supported by the comments of two of the judges on the *Food Not Bombs* panel. 450 F.3d at 1052 (Berzon, J., dissenting in part); *id.* at 1058 (Wardlaw, J., concurring). Judge Berzon wrote that the indemnification provision in that case was "not narrowly tailored to the governmental interest in protecting the City from bearing costs arising from injuries or other

liabilities due to the permittees' wrongful conduct of the event or conditions at the site." *Id.* at 1052 (Berzon, J., dissenting in part). Judge Wardlaw acknowledged that the contention that the provision was not narrowly tailored "might have been the better argument," but in her view, the argument had been waived because the plaintiff had failed to raise it. *Id.* at 1058 (Wardlaw, J., concurring).

### 4.   Funding and Waiver of Permit Fee and Departmental Services Charges

The Ordinance authorizes the imposition of a fee for a permit to hold a "special event," as well as the imposition of "departmental services charges" for costs incurred by the City as a result of either "special" or "spontaneous" events. The Ordinance allows the City, in its discretion, to fund or waive the permit fee and the departmental services charges. The Peace Network argues that the funding and waiver provision allows the exercise of unbridled discretion and is therefore unconstitutional. We agree.

The Ordinance provides that "a permit fee" "shall be established by the city council by resolution," but that the fee may be "funded or waived by council resolution or ordinance." LBMC § 5.60.050(A). The Ordinance further provides that "departmental services charges" shall be assessed against a "permittee." *Id.* §§ 5.60.090(a), 5.60.010(C). In this context, the term "permittee" appears to include both someone who has been granted a permit to hold a "special event," as well as someone who is exempt from the formal permit process but has been given permission to hold a "spontaneous" event. The Ordinance provides that departmental services charges may be "funded, partially funded or waived by action of the city council." *Id.* § 5.60.090(A). The Ordinance does not specify criteria for determining whether those fees and charges will be funded or waived by the City Council.

We note at the outset that the unbridled discretion argument is somewhat unusual in this case. Here, the discretion to fund

or waive the fees and charges rests in the hands of the City Council — the elected, legislative body of the City. Unbridled discretion challenges typically arise when discretion is delegated to an administrator, police officer, or other executive official. *See, e.g.*, *Thomas*, 534 U.S. at 318 (Chicago Park District); *Forsyth County*, 505 U.S. at 132 (county administrator); *Cox*, 312 U.S. at 576 (licensing board); *Menotti*, 409 F.3d at 1144 (police officers); *S. Or. Barter Fair*, 372 F.3d at 1137 (Department of Human Services); *Linick*, 195 F.3d at 542 (Forest Service). *But see City of Richmond*, 743 F.2d at 1357 (City Council). Delegation in the administrative law context refers to delegation of legislative authority to the executive branch. *See, e.g.*, *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). In the First Amendment context, some of the delegation of authority concerns are the same, such as lack of accountability and inability to obtain effective judicial review. *See Freedman v. Maryland*, 380 U.S. 56, 57 (1965). Two other concerns, largely unrelated to delegation, are relevant to our First Amendment analysis: the need for narrow tailoring, *Gaudiya Vaishnava Soc'y*, 952 F.2d at 1065, and the desire to eliminate the opportunity for officials to engage in content-based discrimination through the exercise of discretion, *Forsyth County*, 505 U.S. at 133. Those concerns are relevant to a First Amendment analysis even if the discretion remains with a legislative body and has not been delegated to an administrative official.

[24] The permitting scheme of the Ordinance requires organizers to come to the City for permission to hold an expressive event. If a legislative body retains discretion to make an important decision as part of that permitting scheme — here, whether to fund an event or to waive fees and charges — that discretion is distinct from the general discretion a legislative body has to enact (or not enact) laws. Absent a preexisting permitting scheme, a city council could not in advance impose service charges or other fees on a group seeking to hold a demonstration in a public forum. *Cf. Simon & Schuster, Inc.*, 502 U.S. at 115-16; *Rust v. Sullivan*, 500 U.S. 173, 194-95,

199-200 (1991). The Long Beach City Council's reserved authority to waive or fund charges is thus unlike its usual legislative authority. We conclude that in the First Amendment context, where a legislative body has enacted a permitting scheme for expressive conduct but has reserved some decisionmaking authority for itself under that scheme, that reserved authority is vulnerable to challenge on grounds of unbridled discretion.

Our conclusion is supported by *Shuttlesworth v. City of Birmingham*, in which the Supreme Court evaluated an ordinance requiring participants in parades and other public demonstrations to obtain a permit from the "City Commission," 394 U.S. at 148, which was "the governing body of the City of Birmingham," *Shuttlesworth v. City of Birmingham*, 281 Ala. 542, 544 (1967). The Court concluded that because the city's "ordinance . . . conferred upon the City Commission virtually unbridled and absolute power to prohibit" parades and demonstrations, *Shuttlesworth*, 394 U.S. at 150, it was facially unconstitutional. *See id.* at 151. The Tenth Circuit reached a similar conclusion in *Association of Community Organizations for Reform Now (ACORN) v. Municipality of Golden*, 744 F.2d 739, 747 (10th Cir. 1984). The court held that the exercise of unbridled discretion by a city council in a permitting scheme was unconstitutional. It wrote:

> We fail to see how it matters for First Amendment purposes whether unguided discretion is vested in the police or the city council. Vesting either authority with this discretion permits the government to control the viewpoints that will be expressed. Whether the city council or the police exercise this power, we believe that it runs afoul of the basic principle that "forbids the government from regulating speech in ways that favor some viewpoints or ideas at the expense of others."

*Id.* at 747 (quoting *Taxpayers for Vincent*, 466 U.S. at 804). We disagree with the apparently contrary conclusion of the

California Court of Appeal in *Long Beach Lesbian & Gay Pride, Inc. v. City of Long Beach*, 14 Cal. App. 4th 312, 344 (1993) ("It is not a delegation of power to an official but a recognition of the innate authority of the City's legislative body. The city council has the power to grant special permits, and to amend Chapter 5.60; the mere existence of that potential does not present a case of unguided discretion.").

**[25]** The City has pointed to no provision of the Ordinance, or to any implementing regulation, that guides the City Council's decision whether to fund or waive fees and charges. The lack of specific articulated bases for making this decision compels the conclusion that the City Council has unconstitutional unbridled discretion. *See City of Richmond*, 743 F.2d at 1357 ("The dangers of discretion are particularly evident in parade permit schemes, where waivers will often be sought for politically controversial causes. It is precisely when political and social pressures are most likely to affect decisionmaking that objective standards to govern discretion are most essential." (internal quotation marks omitted)).

The City argues, based on *Thomas*, that because the waiver provision is permissive it cannot be an unconstitutional infringement on speech. In *Thomas*, the Supreme Court held that the "permissive nature" of a provision that allowed city officials to grant a permit for an expressive event despite an application's "fail[ure] to meet . . . technical requirements," so long as a waiver did not harm the "policies furthered by the application requirements," was not unconstitutional. 534 U.S. at 325. The Court wrote that the provision "furthers, rather than constricts, free speech." *Id.* The Court added, "Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional, but we think that this abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements." *Id.* The challenged provision in *Thomas* is strikingly dissimilar to the provision in our case. In *Thomas*,

the provision operated only in the narrow circumstance where the permit application was technically deficient. The provision then provided a generous criterion for forgiving the technical defect and allowing the event to go forward despite the defect. By contrast, this Ordinance authorizes the City Council to decide whether to fund or waive fees and charges for all permissive events subject to the Ordinance, not limited to events for which a permit application was technically deficient, and authorizes the City Council to make that decision with no governing criteria whatsoever.

The City argues that the City Council has not, in fact, used its authority to fund or waive fees and charges based on the content of the expressive activity. Even if this were so, it would be irrelevant. The question is not whether a city has unlawfully favored certain messages or certain kinds of speech. The question is whether the ordinance in question allows the City to do so. A presumption that a city official "will act in good faith and adhere to standards absent from the ordinance's face . . . is the very presumption that the doctrine forbidding unbridled discretion disallows." *City of Lakewood*, 486 U.S. at 770.

Although we need not do so for the disposition of this case, we note that, contrary to the City's argument, the record contains evidence of content-based favoritism. The Peace Network held two similar events, separated by less than two months, both with at least 1,000 attendees. For the February event, held before the United States initiated hostilities in Iraq and attended by government officials, the City assessed no fee or charges. For the March event, held after the commencement of hostilities in Iraq and *not* attended by government officials, the City assessed charges of $7,041. This favoritism is a manifestation of the very dangers inherent in unbridled discretion.

The Peace Network does not argue that, in the absence of unbridled discretion, the provisions allowing the assessment

of fees and charges are unconstitutional. We therefore do not address the issue whether, absent the authority to exercise unbridled discretion to fund or waive the fees and charges, the provisions allowing their assessment are narrowly tailored and allow ample alternatives for speech.

## VI.   Severability

**[26]** The district court found that Section 5.60 was a content-based restriction on free speech and issued a permanent injunction against enforcement of the Ordinance in its entirety. We conclude that some features are constitutional and that others are unconstitutional. The parties did not brief the issue of severability before the district court or this court. Severability of a local ordinance is a question of state law. *City of Lakewood*, 486 U.S. at 772; *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 556-57 (9th Cir. 2004) (as amended). We remand so that the district court may conduct the severability analysis in the first instance after briefing from the parties.

## VII.   Conclusion

For the foregoing reasons, we hold that some features of LBMC § 5.60 are constitutional and that others are unconstitutional. We remand to the district court for further proceedings consistent with this opinion.

AFFIRMED in part; REVERSED in part; REMANDED.

---

BERZON, Circuit Judge, concurring:

I concur fully in Judge Fletcher's opinion.

I continue to believe that an insurance requirement of the kind imposed by Long Beach is potentially content-based, and

therefore invalid. The Long Beach ordinance does not limit the requirement to insurance policies priced solely on the size and location of the special event. *See Thomas v. Chicago Park Dist.,* 227 F.3d 921, 925 (7th Cir. 2000) (upholding an insurance requirement where "[t]he required amount and the cost of the insurance depend only on the size of the event and the nature of the facilities involved in it (a bandstand, stage, tents, and so forth)"), *aff'd on other grounds,* 534 U.S. 316 (2002). Instead, the ordinance requires the purchase of insurance even if, as could well be the case, the insurance premium reflects the insurer's assessment of the connection between the risk of loss and the content of the insured's expressive activity. For that reason, were I free to do so, I would follow the substantial case law holding such an insurance requirement unconstitutional as a violation of the First Amendment. *See Santa Monica Food Not Bombs v. City of Santa Monica* ("*Food Not Bombs*"), 450 F.3d 1022, 1049-52 (9th Cir. 2006) (Berzon, J., dissenting in part); *id.* (citing cases invalidating insurance requirements for public forum permits as content-based).

I fully expressed this view, however, in *Food Not Bombs*, but did not prevail. The *Food Not Bombs* majority did not acknowledge the substantial case law supporting my conclusion, and did not consider the likelihood that insurance premiums would, like the fees set in *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992), reflect the content of the permittee's expression and the likely reaction of bystanders to that content. Still, I am bound by *Food Not Bombs* as precedent, and so concur.

I note that the discussion in this opinion of the indemnification provision supports my view that setting an unrestricted insurance requirement as a condition for issuing a permit for expressive activity is unconstitutional. We explain today why the indemnity provision is not narrowly tailored. Insurance companies typically set premiums by first determining the risk of loss. Nothing in the Long Beach ordinance would prevent any issuer from taking into account, in assessing the risk

of loss and then setting the premium for event insurance accordingly, the very considerations we conclude make the indemnity provision insufficiently narrowly tailored. Morever, an insurance requirement demands up front payment even if the insured risk never eventuates, making it even *less* narrowly tailored, and *more* likely to discourage communicative activities in public fora than an indemnity requirement.

I nonetheless concur, as I agree with Judges Fletcher and Pregerson that there is no difference of principle between the insurance requirement in this case and the one in *Food Not Bombs.*