WARDLAW, Circuit Judge,
dissenting:
I respectfully dissent from the majority’s holding that the Redondo Beach (“City”) ordinance is a valid time, place, and manner restriction upon speech occurring on the City’s sidewalks and other public ways — the most traditional of public fora. In the words of Redondo Beach City Attorney Gordon C. Phillips, who recommended the ordinance’s adoption to the City’s Mayor and Council Members, the ordinance “prohibits any person from soliciting from the street ‘employment, business or contributions’ from occupants of vehicles.” The ordinance is facially over-broad and thus violates well-established principles of our First Amendment jurisprudence.
Nor is the ordinance “readily susceptible” to the majority’s cramped reading of it as a mere prohibition of “direct, in-person demands requiring an immediate response from drivers in traffic lanes.” Not even the City has urged this narrow construction of the ordinance. To the contrary, the City argues that the ordinance permits in-person demands directed at drivers who then stop at parking lots. Moreover, the “aim” of the ordinance, and the manner in which the City has selected to enforce it, are simply not relevant considerations when analyzing a claim of facial overbreadth, as the Supreme Court recently reaffirmed in United States v. Stevens. See — U.S. -, -, 130 S.Ct. 1577, 1591, 176 L.Ed.2d 435 (2010). The majority inappropriately clings to its subjective and selective interpretation of our opinion *1197 in ACORN v. City of Phoenix, 798 F.2d 1260 (9th Cir.1986), as fragile life support for its conclusion. The ACORN decision, however, is an inapposite as-applied solicitation case that the district court here and all of our subsequent authority, including our recent en banc decision in Berger v. City of Seattle, 569 F.3d 1029 (9th Cir.2009), have limited to its facts. ACORN holds only that the Phoenix ordinance is constitutional as applied to the invasive practice of “tagging”; the question of constitutional facial overbreadth was not even before our court on appeal, and the argument that the ACORN court did address under the misnomer of facial overbreadth was ACORN’s claim that the ordinance was overbroad because there were some locations in Phoenix where ACORN — as opposed to third parties not before the court — might safely “tag.”
Finally, the majority improperly dispenses with the bedrock principles underlying the protection of speech in a traditional public forum which limit restrictions on protected speech to those narrowly tailored to achieve significant government interests and leaving open alternative avenues of communication. The Redondo Beach ordinance fails to meet this standard. I would therefore affirm the district court’s judgment that the ordinance is a facially overbroad, unconstitutional restriction on speech and the award of attorneys’ fees to Appellees.
I.
On any given day in the State of California, 40,000 individuals are either employed as day laborers or are seeking day labor jobs. See Arturo Gonzalez, Day Labor in the Golden State, Cal. Econ. Pol’y, July 2007, at 1. Known in Spanish as “jornaleros,” day laborers frequently serve as independent contractors and perform a variety of services, including gardening, housekeeping, and construction. Because of the temporary, informal nature of their employment, day laborers must forgo more traditional forms of advertising to signal their availability for work. Instead, to offer themselves for employment, they must congregate in a visible public place known to potential employers. This visibility has made day laborers the target of local regulators, often because of a perception that they pose a threat to public safety or that they are undocumented immigrants. Id.
The congregation of day laborers on public sidewalks spurred the City to enact Municipal Code § 3-7.1601 in 1987 (“Ordinance”). The Ordinance provides:
(a) It shall be unlawful for any person to stand on a street or highway and solicit, or attempt to solicit, employment, business, or contributions from an occupant of any motor vehicle. For purposes of this section, “street or highway” shall mean all of that area dedicated to public use for public street purposes and shall include, but not be limited to, roadways, parkways, medians, alleys, sidewalks, curbs, and public ways.
Two years later, the City enacted subsection (b), which provides:
(b) It shall be unlawful for any person to stop, park or stand a motor vehicle on a street or highway from which any occupant attempts to hire or hires for employment another person or persons.
According to the City Attorney, the Ordinance was enacted in response to complaints from local residents and business owners about day laborers gathering along city streets and congregating on sidewalks. They complained that the day laborers impeded the flow of traffic, littered, damaged property, and harassed females.
In recent years, the Ordinance has been enforced aggressively by the Police De *1198 partment, which concluded that verbal and written warnings to day laborers and their potential employers were ineffective, due mostly to the lack of any follow-up enforcement. As a result, in October and November 2004, the police launched a sweeping sting operation called the “Day Labor Enforcement Project.” The police conducted the sting operation in three phases, covering various hours of the day during which day laborers congregated. Undercover police officers posing as employers offered employment to the assembled day laborers and arrested those who accepted. Comite De Jornaleros De Redondo Beach v. City of Redondo Beach, 475 F.Supp.2d 952, 955 (C.D.Cal.2006). The operation ultimately netted around sixty arrests. Those arrested and convicted of violating the Ordinance received three years of probation, a 180 day suspended sentence, a $314.00 booking fee, and were enjoined to stay 150 yards away from the public sidewalk where they were arrested. The Ordinance has thus prohibited day laborers in the City from engaging in solicitation signaling their availability for work, and, effectively, from obtaining employment.
Two unincorporated day laborer associations, Comité de Jornaleros de Redondo Beach' (“Jornaleros”) and the National Day Laborer Organizing Network (“NDLON”) filed suit in the Central District of California seeking monetary, injunctive, and declaratory relief on the grounds that the Ordinance violates their day laborer members’ right to free speech under the First and Fourteenth Amendments.[1] The district court preliminarily enjoined the City from enforcing the Ordinance or any violations of probation following convictions under the Ordinance, and it mandated continuances of any ongoing prosecutions. Comite, 475 F.Supp.2d at 956. The City appealed the grant of the preliminary injunction and a three-judge panel of our court unanimously affirmed. Comité de Jornaleros de Redondo Beach v. City of Redondo Beach, 127 Fed. Appx. 994 (9th Cir.2005). The parties then filed crossmotions for summary judgment on the facial constitutionality of the *1199 Ordinance. The district court ruled that although the Ordinance is content neutral, it is unconstitutionally overbroad. The district court specifically rejected the City’s contention that our opinion in ACORN v. City of Phoenix was controlling precedent, correctly determining that ACORN involved an “as-applied” challenge and was otherwise distinguishable on its facts. Comite, 475 F.Supp.2d at 964-65.
Concluding that the Ordinance was not narrowly tailored to achieve the City’s significant interests in traffic flow and safety, and finding that the City presented no evidence of an available alternative means of communication, the district court determined that the Ordinance is not a valid time, place, or manner restriction on speech. Id. at 968. The court permanently enjoined the City from enforcing the Ordinance, and this appeal ensued. Id.
II.
The First Amendment fully protects solicitation. Vill. of Schaumburg v. Citizens for a Better Env’t, 444 U.S. 620, 628-32, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); Berger, 569 F.3d at 1050. As we have stated, “It is beyond dispute that solicitation is a form of expression entitled to the same constitutional protections as traditional speech.” ACLU v. City of Las Vegas (ACLU II), 466 F.3d 784, 792 (9th Cir. 2006). Solicitation “is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes.” Vill. of Schaumburg, 444 U.S. at 632, 100 S.Ct. 826. Without it, “the flow of such information and advocacy would likely cease.” Id. The protection afforded solicitation is not reduced simply because the solicitor seeks to have an indh vidual contribute money. See Bates v. State Bar of Arizona, 433 U.S. 350, 363, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). Because solicitation requires effective access to the public, “[r]ules that regulate solicitation in public fora are ... subject to the same standards as those that limit other forms of speech.” Berger, 569 F.3d at 1050; see also ACLU II, 466 F.3d at 792 (“It is beyond dispute that solicitation is a form of expression entitled to the same constitutional protections as traditional speech.”). Therefore, the Ordinance burdens fully protected speech in traditional public fora.
Nonetheless, the majority characterizes the Ordinance as regulating only conduct. This is not the case; it plainly “prohibits any person from soliciting from the street ‘employment, business, or contributions’ from occupants or vehicles,” as the City Attorney describes it. Our case law holds that such bans on solicitation are bans on speech. In Berger, our court, sitting en banc, confronted a regulation that prevented street performers from “actively soliciting] donations, for example by live or recorded word of mouth, gesture, mechanical devices, or second parties.” 569 F.3d at 1050. We explicitly rejected the city’s contention that this provision merely regulated conduct, finding instead that it regulated speech by seeking to restrict the “medium and manner” of that speech. Id. at 1051. Here, too, the Ordinance’s text does not prohibit conduct, such as the immediate transfer of funds. Rather, just like the active solicitation ban in Berger, the Ordinance regulates the “medium and manner” of protected speech.
Worse, the prohibition on protected speech operates exclusively on the public streets and sidewalks of Redondo Beach quintessential public fora. Berger, 569 F.3d at 1036 & n. 3; ACLU v. City of Las Vegas (ACLU I), 333 F.3d 1092, 1099 (9th Cir.2001); see also United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). Public streets are *1200 public fora by their very nature; no governmental action designating them as such is required. Grace, 461 U.S. at 177, 103 S.Ct. 1702; see also U.S. Postal Serv. v. Council of Greenburgh Civic Ass’ns, 453 U.S. 114, 133, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981) (“Congress, no more than a suburban township, may not by its own ipse dixit destroy the ‘public forum’ status of streets and parks.... ”). Streets and other public fora “occup[y] a special position in terms of First Amendment protection.” Grace, 461 U.S. at 180, 103 S.Ct. 1702.
This “special position” of traditional public fora is the product of more than a century of Supreme Court precedent, and it is now well established. Dicta by Justice Roberts in Hague v. Committee for Industrial Organization, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), first articulated a view of traditional public fora that exalted the individual’s right to speak and assemble over the state’s proprietary interest. The Hague Court invalidated a city ordinance requiring a permit for any public parade or assembly “in or upon the public streets, highways, public parks or public buildings.” Id. at 503 n. 1, 59 S.Ct. 954. Justice Roberts, writing for himself and Justice Black, famously wrote:
Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.
Id. at 515, 59 S.Ct. 954. Under this view, the existence of traditional public fora is inextricably intertwined with their historical status as places for important expressive activity. This dicta ultimately established a First Amendment easement, allowing individuals to commandeer public fora for expressive purposes. Harry Kalven, Jr., The Concept of the Public Forum: Cox v. Louisiana, 1965 UCLA L.Rev. 1, 12-13. It has become an unassailable principle of the First Amendment and is the foundation of the modern public fora doctrinal framework. See, e.g., Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); Kunz v. New York, 340 U.S. 290, 293-94, 71 S.Ct. 312, 95 L.Ed. 280 (1951); Jamison v. Texas, 318 U.S. 413, 415, 63 S.Ct. 669, 87 L.Ed. 869 (1943). Consequently, in Berger, our most recent exegesis on the subject, we recognized the “bedrock principle” that the “protections afforded by the First Amendment are nowhere stronger than in streets and parks.” Berger, 569 F.3d at 1035-36 (footnote omitted).
The government’s power to pass laws, regulations, or ordinances affecting speech in these areas is therefore strictly limited. Pleasant Grove City v. Summum, — U.S. -, 129 S.Ct. 1125, 1132, 172 L.Ed.2d 853 (2009); see also Capitol Square Rev. & Advisotry Bd. v. Pinette, 515 U.S. 753, 761, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (“[A] State’s right to limit protected expressive activity [in a traditional public fora] is sharply circumscribed....”). This is not a jurisprudential accident; as places where individuals may express themselves without regard to the resources of the speaker or popularity of the message, traditional public fora serve as the main bulwark of the First Amendment. See Int’l Soc’y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 708, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (Kennedy, J., concurring) (“One of the primary purposes of the public forum is to provide persons who lack access to more sophisticated media the opportunity to- speak.”); cf. Kalven, *1201 supra, at 12. Whether the First Amendment is viewed as a means for pursuing truth or ensuring self-expression,[2] meaningful access to society is fundamental. See Thomas I. Emerson, The System of Freedom of Expression 305-06 (1970). Thus, open access to traditional public fora guarantees the continued vitality of the First Amendment, especially in light of the growing privatization of many traditional public fora. See PruneYard Shopping Center v. Robins, 447 U.S. 74, 90-91, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (Marshall, J., concurring).
Of course, individuals’ First Amendment rights on public ways are not absolute; the government has the authority to pass reasonable time, place, or manner restrictions. To pass constitutional muster, however, the government must demonstrate that the regulation is “ ‘justified without reference to the content of the regulated speech, that [it is] narrowly tailored to serve a significant governmental interest, and that [it] leave[s] open ample alternative channels for communication of the information.’ ” Lee v. Katz, 276 F.3d 550, 557 (9th Cir.2002) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). When applying this test, courts must not lose sight of the core constitutional liberties that are implicated. Freedom of speech is one of the “fundamental personal rights and liberties” guaranteed the public; this characterization “is not an empty one and [is] not lightly used.” Schneider v. New Jersey, 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155 (1939). The fundamental nature of the right “stresses ... the importance of preventing the restriction of enjoyment of these liberties.” Id. When the government infringes the public’s fundamental right to assemble and speak, courts must approach the regulation skeptically and place the onus squarely on the government to justify the enacted regulation. Cf. Long Beach Area Peace Network v. City of Long Beach, 574 F.3d 1011, 1022 (9th Cir.2009) (“‘Public fora have achieved a special status in our law; the government must bear an extraordinarily heavy burden to regulate speech in such locales.’ ”) (quoting NAACP v. City of Richmond, 743 F.2d 1346, 1355 (9th Cir.1984)).
The City has failed to meet this heavy burden. Subsection (a) of the Ordinance is a total ban on speech in traditional public fora, while subsection (b) prohibits persons in even lawfully parked cars from hiring, or attempting to hire, anyone for employment. On its face, the Ordinance sweeps far more broadly than what is justified by the City’s interests in traffic flow and safety, and it does not leave open ample alternatives for communication.[3] Ignoring the full body of jurisprudence governing speech in public fora, the majority seizes *1202 upon one inapposite decision of our court, in which we addressed an as-applied challenge to a similar ordinance, to hold the Ordinance constitutional.
A ACORN v. City of Phoenix Does Not Apply to, Much Less Control, this Appeal.
The majority opinion rests entirely on ACORN v. City of Phoenix to conclude that the Ordinance is a valid time, place, or manner regulation. The ACORN court, however, confronted a very specific, narrow set of circumstances to which the parties in that case stipulated and to which we have subsequently confined it. Thus, the ACORN decision does not control this case. ’
In ACORN, the Association of Community Organizations for Reform Now (“ACORN”) claimed that a Phoenix ordinance restricting solicitation infringed its First Amendment rights. ACORN engaged in a practice referred to as “tagging” as part of its effort to raise funds for promoting the concerns of low and moderate income citizens. ACORN, 798 F.2d at 1262. Phoenix officials specifically warned ACORN that its practice of tagging violated the city ordinance prohibiting an individual from “standing] on a street or highway and solicit[ing], or attempt[ing] to solicit, employment, business or contributions from the occupants of any vehicle.” Id. ACORN then instituted a civil rights action in federal district court, seeking damages pursuant to 42 U.S.C. § 1983 and a declaratory judgment that the ordinance was either inapplicable to its tagging practice or unconstitutional. Id. Before the district court, the ACORN parties entered into a stipulation, which, among other things, agreed to the precise conduct at issue:
Within the City of Phoenix, various of the plaintiffs have implemented ... various fund solicitation and information dissemination programs.... Said programs are commonly known as ‘tagging,’ which usually involves an individual stepping into the street and approaching a car when it is stopped at a red light. The individual asks for a contribution to his/her cause, and when such a contribution is given, the solicitor gives the contributor a slip of paper providing information concerning his/her cause, — e.g., where and how to participate in the cause, how to become involved further, and so forth.
Pretrial Order at 3, ACORN v. City of Phoenix, 603 F.Supp. 869 (D.Ariz.1985) (No. 83-870) (emphasis added). The district court found that the ordinance was constitutional as applied to ACORN’s practice of soliciting contributions by tagging. See ACORN, 603 F.Supp. at 872.
We agreed that the ordinance was constitutional as applied to ACORN’s tagging practices as defined by the parties. We held that the “Phoenix ordinance is aimed narrowly at the disruptive nature of fund solicitation from the occupants of vehicles. Direct communication of ideas, including the distribution of literature to occupants in vehicles, is not restricted.” ACORN, 798 F.2d at 1268. Our decision focused exclusively on the disruption to drivers temporarily stopped on the road in the midst of traffic and to the flow of traffic itself caused by persons stepping into the street seeking an immediate contribution of money from the driver:
Unlike oral advocacy of ideas, or even the distribution of literature, successful solicitation requires the individual to respond by searching for currency and passing it along to the solicitor. Even after the solicitor has departed, the driver must secure any change returned, replace a wallet or close a purse, and *1203 then return proper attention to the full responsibilities of a motor vehicle driver.
Id. at 1269. The majority takes this quote out of context to support its broader reading of the ACORN decision to uphold bans on all types of solicitation. Read properly, however, ACORN focused entirely on the practice of in-person, immediate demands for funds in the street that actually disrupt the driver from continuing on.
Contrary to the majority’s assertion, the ordinance we upheld in ACORN and the City’s Ordinance differ in critical respects. The Phoenix ordinance involved in ACORN prohibited “solicitation” only by people who were standing in a street or highway. It provided:
No person shall stand on a street or highway and solicit, or attempt to solicit, employment, business or contributions from the occupants of any vehicle.
ACORN, 798 F.2d at 1262 (quoting Phoenix City Ordinance § 36-101.01). By contrast, and despite the majority’s strained efforts to limit it, the City’s Ordinance sweeps far more broadly. First, the Phoenix ordinance applied only to solicitation on streets and highways. The Redondo Beach Ordinance applies to “all of that area dedicated to public use for public street purposes and shall include, but not be limited to, roadways, parkways, medians, alleys, sidewalks, curbs, and public ways.” Redondo Beach Municipal Code § 3-7.1601(a). The ACORN decision itself recognized the greater importance of sidewalks to expressive activity, reasoning:
As a practical matter, there are indeed substantial differences in nature between a street, kept open to motorized vehicle traffic, and a sidewalk or public park. A pedestrian ordinarily has an entitlement to be present upon the sidewalk or on the grounds of a park and thus is generally free at all times to engage in expression and public discourse at such locations. This is obviously not true of streets continually filled with pulsing vehicle traffic. Consequently, more so than with sidewalks or parks, courts have recognized a greater governmental interest in regulating the use of city streets.
ACORN, 798 F.2d at 1267. Second, the Ordinance contains subsection (b), which covers an entire category of individuals— potential employers — that the Phoenix ordinance left unregulated. The City provides no justification for prohibiting willing listeners from lawfully stopping their vehicles for the purpose of lawfully “hir[ing] for employment another person or persons.” Given its greater breadth in terms of where and to whom it applies, the City’s Ordinance “sweeps in a much larger amount of ‘solicitation’ speech and speech-related conduct than the ordinance at issue in ACORN” and the holding as to the narrower statute does not control our review of the broader.[4] Comite, 475 F.Supp.2d at 964-65.
Our court has also subsequently made clear the narrow reach of the ACORN decision. In ACLU II, we construed ACORN as upholding “a ban on in-hand solicitation from automobiles.” 466 F.3d at 794. More recently, sitting en banc, we explicitly rejected the expansive reading of ACORN by the majority here, concluding that it only upheld a prohibition on “the immediate physical exchange of money.” Berger, 569 F.3d at 1052 n. 23. A careful *1204 reading of the ACORN decision itself, as well as our subsequent interpretation of its holding, make clear that it upheld the constitutionality of a narrower ordinance only as applied to a highly invasive form of solicitation on the streets for an immediate exchange of funds that actually disrupted traffic.
The majority belatedly suggests that ACORN presented a facial overbreadth challenge to the Phoenix ordinance. The district court had rejected this challenge as untimely, see ACORN, 603 F.Supp. at 872, but our court allowed ACORN to make its “overbreadth” argument because it agreed with the trial court’s conclusion (after trial) that “there was no evidence to suggest that the Phoenix ordinance curtailed any activity other than solicitation from vehicles at an intersection.” ACORN, 798 F.2d at 1272. Although our court labeled this challenge as one of facial overbreadth, the argument ACORN actually made was not the type of facial challenge we recognize in the First Amendment context. As the Court said in Stevens, “In the First Amendment context ... this Court recognizes ‘a second type of facial challenge,’ whereby a law may be invalidated as overbroad if ‘a substantial number of its applications are unconstitutional, judged in relation to the statute’s plainly legitimate sweep.’ ” 130 S.Ct. at 1587 (quoting Wash. St. Grange v. Wash. St. Republican Party, 552 U.S. 442, 449 n. 6, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008)). In the First Amendment area litigants “are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute’s very existence may cause others not before the court to refrain from constitutionally protected speech or expression.” Broadrick v. Oklahoma, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).
ACORN’s briefs on appeal to our court demonstrate that its so-called “facial challenge” was not what we have long considered a First Amendment overbreadth challenge. All that ACORN argued was that the Phoenix ordinance regulated its own tagging activity “too broadly.” Plaintiff-Appellants’ Reply Brief at 18, ACORN v. City of Phoenix, 798 F.2d 1260. The City of Phoenix, in its own reading of ACORN, also recognized ACORN’s argument for what it was — a simple argument that the ordinance “seeks to prohibit ‘tagging’ not just on the roadway, but also on sidewalks and other ‘safe’ locations.”[5] Brief of Appellees at 13, ACORN v. City of Phoenix, 798 F.2d 1260. No “speech” other than tagging was at issue; no other party’s interests but ACORN’s were asserted.
By contrast, the plaintiffs here make only a First Amendment facial over-breadth challenge to the Ordinance. Therefore, neither ACORN’s as-applied holding nor its so-called overbreadth holding is applicable, much less controlling. We must find the Redondo Beach Ordinance unconstitutional if a danger exists that the Ordinance will “significantly compromise recognized First Amendment protections of parties not before the Court.” City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 801, 104 S.Ct. 2118, 80 *1205 L.Ed.2d 772 (1984); see also ACLUII, 466 F.3d at 790 n. 9 (“ ‘Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society — to prevent the statute from chilling the First Amendment rights of other parties not before the court.’ ” (quoting Sec’y of State v. Joseph H. Munson Co., 467 U.S. 947, 958, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984))). This inquiry requires us to look beyond the application in the present case and examine the potential scope of the statute because “ ‘[t]he threat of sanctions may deter [speech] almost as potently as the actual application of sanctions. Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.’ ” IDK, Inc. v. Clark County, 836 F.2d 1185, 1190 (9th Cir.1988) (quoting NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)); see also Broadrick, 413 U.S. at 611-12, 93 S.Ct. 2908 (“It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society.”).
However, even if plaintiffs had brought an as-applied challenge, their solicitation of employment could not be more distinct from conduct causing immediate disruption of traffic flow. As the City itself argues, “ACORN addressed the application of an essentially identical ordinance to people who went into the street to solicit cars that already had stopped at a red light.” The evils found by the ACORN court — all associated with an individual entering the street itself, approaching a captive target, and requesting the immediate exchange of money — are simply not implicated where a willing driver approaches a willing would-be employee. Cf. Hill v. Colorado, 530 U.S. 703, 715-16, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (“It is also important ... to recognize the significant difference between state restrictions on a speaker’s right to address a willing audience and those that protect listeners from unwanted communication.”). Furthermore, the speech at issue here does not involve solicitation, or attempted solicitation, of immediate, in-hand contributions of funds. In fact, the record demonstrates (1) no Jornaleros or NDLON members were arrested for soliciting an immediate exchange of funds, and (2) day laborers have been arrested simply for being on the sidewalk and approaching a stopped vehicle. The very nature of the potential employer/day laborer relationship belies the majority’s assertion that an immediate exchange of money is required. No rational employer would pay the day laborer before the work was performed. Indeed, there is no demand that an unwilling driver do anything at all.
Day laborers in the City have not been prosecuted under this Ordinance for requesting an immediate, in-hand contribution of money. The majority’s use of ACORN to justify the application of the Ordinance to their activities, therefore, represents a marked expansion of ACORN’s scope directly contrary to controlling precedent. More fundamentally, as an as-applied challenge, ACORN did not address the broader question that we are now called on to answer.

B. The Ordinance Is Not Narrowly Tailored to Legitimate Governmental Interests.

The Ordinance is not a valid time, place, or manner restriction because it is not narrowly tailored to the significant govern *1206 mental interests asserted by the City.[6] To be narrowly tailored, an ordinance must “ ‘promote[ ] a substantial government interest that would be achieved less effectively absent the regulation’ ” and may not “burden substantially more speech than is necessary to further the government’s legitimate interests.” Ward, 491 U.S. at 799, 109 S.Ct. 2746 (quoting United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)). A narrowly tailored ordinance is one that “ ‘target[s] and eliminate[s] no more than the exact source of the ‘evil’ it seeks to remedy.’ ” ACLU II, 466 F.3d at 796 n. 13 (quoting Menotti v. City of Seattle, 409 F.3d 1113, 1131-32 (9th Cir.2005)). The Ordinance, on its face, sweeps far more broadly than necessary to advance the City’s interest in traffic flow and safety. This over-inelusiveness is fatal to the constitutionality of the Ordinance.
As the district court explained, the Ordinance prohibits a wide variety of expression that bears little to no relationship to the City’s proffered interests. See, e.g., Comite, 475 F.Supp.2d at 965 n. 8 (“In fact, the Ordinance would technically apply to children selling lemonade on the sidewalk in front of their home, as well as to Girl Scouts selling cookies on the sidewalk outside of their school.”). It expansively bans all solicitations (or attempts at solicitations) for employment, business, or contributions from an occupant of any motor vehicle. The Ordinance prohibits, among other things, solicitation of employment or a contribution from a motorist in a lawfully stopped or parked car. It prohibits an individual from standing on a sidewalk and distributing to a passenger in a lawfully stopped car fliers noting his availability for employment and providing a cell phone number. Similarly, the Ordinance would prohibit a restauranteur from standing on a sidewalk waiving a sign at drivers inviting them to patronize his establishment, or other signbearers on sidewalks seeking patronage or offering handbills even though their- conduct does not pose a traffic hazard. See ACORN, 798 F.2d at 1269 n. 8 (“The degree of distraction entailed by ACORN’s ‘tagging’ practices is plainly far greater. It is much easier to ignore a billboard or pedestrian along the roadway. ...”). Neither the City nor the majority explains the relationship these prohibitions bear to traffic flow and safety.
The majority dismisses the overbreadth challenge, asserting that “Hypothetical examples of how the government could theoretically apply an ordinance ... are not sufficient to establish inadequate tailoring.” Maj. Op. at 1191 (citing Wash. St. Grange, 128 S.Ct. at 1190 (2008)). The Supreme Court stated in Washington State Grange that courts approaching a facial challenge to a law “must be careful not to go beyond the statute’s facial requirements and speculate about ‘hypothetical’ or ‘imaginary’ cases.” Wash. St. Grange, 128 S.Ct. at 1190. Here, however, the district court properly confined its analysis to the statute’s “facial requirements.” As the district court reasoned, “by its very terms, the Ordinance at issue *1207 here sweeps in a much larger amount of ‘solicitation’ speech and speech-related conduct than the ordinance at issue in ACORN.” Comite, 475 F.Supp.2d at 964.
Courts “ ‘may impose a limiting construction on a statute only if it is readily susceptible to such a construction.’” Stevens, 130 S.Ct. at 1591-92 (quoting Reno v. ACLU, 521 U.S. 844, 884, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997)); see also S.O.C., Inc. v. County of Clark, 152 F.3d 1136, 1143-44 (9th Cir.1998) (rejecting a limiting construction where the “Ordinance’s plain language does not limit the scope of the regulated activity” as suggested by the county). The Ordinance is not “readily susceptible” to the majority’s reading that it prohibits only “direct, in-person demands requiring an immediate response from drivers in traffic lanes.” Maj. Op. at 1195. In Foti v. City of Menlo Park, 146 F.3d 629 (9th Cir.1998), we confronted a Menlo Park ordinance that included a prohibition on the posting or displaying of signs on vehicles with the intent to “display, demonstrate, advertise, or attract the attention of the public.” Id. at 634 n. 3. Menlo Park proffered a construction that narrowed the prohibition to only “temporary” signs. Id. at 639. We rejected the attempt to narrowly construe the ordinance, noting that “we are not required to insert missing terms into the statute or adopt an interpretation precluded by the plain language of the ordinance” and that the “plain language of [the ban] applies to all signs on vehicles, not just temporary signs.” Id.; see also Conchatta Inc. v. Miller, 458 F.3d 258, 265 (3d Cir.2006) (finding the “plain terms” of a challenged ordinance not “readily susceptible” to a limiting construction); Ripplinger v. Collins, 868 F.2d 1043, 1056 (9th Cir.1989) (“[T]he language of the definition does not seem readily susceptible to a narrowing construction. It would be necessary to add language requiring that the defendant have knowledge of the ‘overall character’ of the material.... ”).
By its very terms, the Ordinance bans all solicitation for contributions, employment, or business from an occupant of any motor vehicle. This is not a case in which “solicitation” may be construed only to include a physical exchange of funds as in International Society for Krishna Consciousness v. Lee, Inc., 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). In that case, the Supreme-Court examined a regulation imposed by the New York Port Authority over all of New York’s airports prohibiting, in part, “[t]he solicitation and receipt of funds.” Id. at 676, 112 S.Ct. 2701. The Court upheld the regulation under the reasonableness standard applicable to nonpublie fora. See id. at 683-84, 112 S.Ct. 2701. Justice Kennedy in his concurring opinion — joined by Justices Blackmun, Stevens, and Souter — viewed the airports as public fora, but nonetheless voted to uphold the regulation. See id. at 704-05, 112 S.Ct. 2701 (Kennedy, J„ concurring). Justice Kennedy found that the regulation, properly read, reached only in-person demands for an immediate contribution of money because, under any broader reading of the term solicitation, “the ‘receipt of funds’ phrase would be written out of the provision.” Id. at 704, 112 S.Ct. 2701. Here, there is simply no way to be both faithful to the English language and to read the Ordinance as prohibiting only solicitations requiring an “immediate” response. The majority attempts in vain to rewrite the Ordinance to render it constitutional when its plain language embraces protected speech; we should not redraft the City’s ordinances. Our obligation is to evaluate the ordinance the City passed, not the ordinance it could have, or should have, passed. See Virginia v. Am. Booksellers Ass’n, 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Edüd 782 (1988) (“[W]e will not *1208 rewrite a state law to conform it to constitutional requirements”). Where a statute is overbroad, all enforcement is invalidated “ ‘until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.’” United States v. Adams, 343 F.3d 1024, 1034 (9th Cir.2003) (quoting Virginia v. Hicks, 539 U.S. 113, 119, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003)).
“Not to worry” the City (and the majority) say: The City construes the ordinance as reaching only people “soliciting vehicles so as to cause a driver to stop in traffic” or in “any other manner that caused traffic blockages.” “But the First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.” Stevens, 130 S.Ct. at 1591; see also Conchatta, 458 F.3d at 265 (“Past practice does not constitute a narrowing construction because it does not bind the enforcement agency, which could, at some point in the future, decide to target a broader range of establishments. This possibility of expanded enforcement creates a chilling effect.”); Odle v. Decatur County, 421 F.3d 386, 397 (6th Cir.2005) (“[Neither proof that an ordinance as currently applied has no unconstitutional effect, nor assurances offered by the relevant local authorities that the ordinance will not be put to such an effect in the future, constitute ‘constructions’ of the ordinance, as the term is ordinarily understood.”). Thus, it is not true, as the majority asserts, that the City has “authoritatively construed” the Ordinance to apply to actual disruptions to traffic, and even if it were true that the City only narrowly enforces the Ordinance to meet its traffic and safety concerns, this would not save the Ordinance.
Similarly, in our en banc opinion in Berger, we relied on the plain language of the statute to find overbreadth without regard to how the city enforced its ordinance. There, a performer challenged several city regulations of Seattle Center, including a content-neutral permitting regime requiring “street performers” to obtain permits to perform in the park. The definition of “street performer” included “a member of the general public who engages in any performing art or the playing of any musical instrument, singing or vocalizing, with or without musical accompaniment.” Berger, 569 F.3d at 1046. We recognized the breadth of the ordinance encompassed
any individual who wishes to sing, dance, or play an instrument while on the Center’s grounds. Protest songs, playing the guitar at a picnic, even whistling are swept up into this broad definition. An individual strumming on a guitar at a family picnic surely poses no problem to the safety and convenience of fellow park-goers.
Id. We found that “the permitting requirement applies to street performers who pose no realistic coordination or traffic flow concerns.” Id. Even though there was no evidence that Seattle applied the ordinance against a whistling tourist or guitar-playing picknicker, we did not turn a blind eye to the reach of the ordinance’s plain language.
Finally, the City has numerous alternatives available to further its asserted interests that do not burden protected speech. “We have said that ‘if there are numerous and obvious less-burdensome alternatives to the restriction on [protected] speech, that is certainly a relevant consideration in determining whether the ‘fit’ between means and ends is reasonable.’ ” Menotti, 409 F.3d at 1131 n. 31 (quoting City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 417 n. 13, 113 S.Ct. 1505, 123 *1209 L.Ed.2d 99 (1993)). In Berger, we recognized that the Seattle regulation’s “broad sweep prohibits much more speech than the ‘evil[s]’ it seeks to remedy require, and the main objectives of the City’s advance registration scheme could be achieved by far less intrusive means.” Berger, 569 F.3d at 1048.
No “legal” imagination need be exercised here; the City can simply enforce its existing traffic and safety ordinances to eliminate its articulated concerns. See Cal. Veh.Code § 22500 (prohibiting vehicle stopping, standing, or parking in a number of areas); id. § 22651(b) (permitting removal of a vehicle that is obstructing the normal movement of traffic or creating a hazard to other traffic); id. § 21961 (allowing local authorities to adopt ordinances preventing pedestrians from crossing roadways in places other than crosswalks); Redondo Beach Municipal Code § 3-7.1004 (“No person shall stand in any roadway, other than in a safety zone or in a crosswalk, if such action interferes with the lawful movement of traffic.”); id. § 3-7.1204 (allowing the City to establish no parking zones prohibiting persons from stopping, standing, or parking in those areas); id. § 3-7.1307 (allowing the City to prohibit parking in a number of circumstances including where it would “create a hazard to life or property or a serious obstruction to vehicular or pedestrian passage”). As this sketch of the regulatory landscape reveals, the City has ample means to advance its interest in traffic flow and safety without encroaching upon a large swath of protected expressive activity. The City has not even attempted to explain how a focused effort at enforcing the state and local traffic, littering, and harassment statutes would not advance its interests even more effectively than does the challenged Ordinance.
Given that the Ordinance encompasses a substantial amount of protected expressive activity unrelated to the City’s articulated interests, the Ordinance is not narrowly tailored. This conclusion is reinforced by the “numerous and obvious less-burdensome alternatives” the City has at its disposal that would advance its interests equally well. Menotti, 409 F.3d at 1171. The City, therefore, has failed to meet its burden of demonstrating that the Ordinance “ ‘promotes a substantial government interest that would be achieved less effectively absent the regulation.’ ” Ward, 491 U.S. at 799, 109 S.Ct. 2746 (quoting United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)).

C. The Ordinance Leaves Open No Effective Alternative Avenue of Communication.

The Ordinance effectively eliminates the only means by which day laborers can communicate their availability for employment. The City bears the burden of demonstrating that the day laborers have ample alternatives to engage in their solicitation of employment. Lim v. City of Long Beach, 217 F.3d 1050, 1054 (9th Cir.2000). It cannot rely on extenuated “alternatives” which may remotely or hypothetically provide an avenue for expression. Where “ ‘there is no other effective and economical way for an individual to communicate his or her message,’ alternative methods of communication are insufficient.” United Bhd. of Carpenters and Joiners of Am. v. NRLB, 540 F.3d 957, 969 (9th Cir.2008) (quoting Edwards v. City of Coeur d’Alene, 262 F.3d 856, 866 (9th Cir.2001)). While we will not “invalidate a regulation merely because it restricts the speaker’s preferred method of communication,” the alternative must allow the individual to effectively convey her message to her intended audience. Id.; Edwards, 262 F.3d at 866.
*1210 The City advances a number of potential alternatives, none of which passes constitutional muster. First, it implicitly argues that door-to-door canvassing, telephone solicitation, or direct mailing would allow day laborers to solicit employment effectively.[7] As NDLON’s Legal Programs Coordinator Chris Newman described, however, the informal, transitory nature of day laborer employment renders these more conventional means of solicitation and advertising ineffective. Moreover, each of the City’s suggestions would impose an economic burden upon day laborers which does not exist in the public forum. The cost and convenience of a suggested alternative is directly relevant to whether the alternative is constitutionally adequate. See City of Ladue v. Gilleo, 512 U.S. 43, 57, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994); Long Beach Area Peace Network, 574 F.3d at 1025; Bay Area Peace Navy v. United States, 914 F.2d 1224, 1229 n. 3 (9th Cir.1990) (“In addition to accessibility to an audience or forum generally, an alternative has been held not ‘ample’ or adequate because, among other things, it is ‘more expensive’ than the prohibited means of communication.”) (citing City of Watseka v. III. Pub. Action Council, 796 F.2d 1547, 1558 (7th Cir.1986)).
The City and majority also assert that soliciting pedestrians on the side of the road is an acceptable alternative. Maj. Op. at 1195-96. However, this “alternative” is also illusory. The Ordinance poses a serious risk that solicitation directed at pedestrians on the sidewalk will be chilled because a solicitor targeting pedestrians cannot control the potential response of passing motorists. A day laborer could intend to solicit only passing pedestrians, but if a driver stopped and attempted to engage him, it could appear to an observing police officer that he was attempting to solicit passing traffic. This lack of control over a driver’s response, which is tantamount to a lack of control over a violation of the Ordinance, makes this “alternative” unavailable. More fundamentally, as the district court found, “most individuals who set out seeking to hire day laborers do so in their cars.” Comite, 475 F.Supp.2d at 968. Thus, that day laborers may technically remain free to solicit employment from pedestrians does not answer the relevant question: whether the day laborers would be able to solicit their target audience. See United States v. Baugh, 187 F.3d 1037, 1044 (9th Cir.1999); see also Heffron v. Int’l Soc’y for Krishna Consciousness, Inc., 452 U.S. 640, 655, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (“The First Amendment protects the right of every citizen to ‘reach the minds of willing listeners’ and to do so there must be an opportunity to win their attention.”).
Even if it were accepted that day laborers could reach certain members of their target audience by soliciting pedestrians, the alternative would still not be a sufficient means of protecting Plaintiffs’ First Amendment interests. In Edwards, we held that an alternative which allowed the speaker to solicit only a segment of his *1211 target audience was inadequate. There, a Los Angeles ordinance prohibited the carrying of signs that were attached to wooden or plastic handles during parades or public assemblies. Edwards, 262 F.3d at 858-59. The City of Los Angeles asserted that handing out leaflets, holding up signs, singing, shouting, or chanting constituted alternative means to convey messages. Id. at 867. We rejected those alternatives, finding that the noise and large size of the crowds rendered the proposed alternatives ineffective for the protestors “to convey their messages to the broad audience they seek to attract.” Id. We reached this result despite the fact that some individuals in the crowd would have been able to see hand-held signs, obtain handbills, or hear the shouting. Compared to the use of supported signs, the proposed alternatives impermissibly narrowed the audience the speaker could reach. Similarly here; the suggested alternative means of soliciting pedestrians is an ineffective method for day laborers to reach their target audience. Therefore, it is legally insufficient.
The majority next argues that the ability of a day laborer to engage a driver who has lawfully parked constitutes a valid alternative. As already demonstrated, however, the plain text of the Ordinance bans this behavior. It broadly prohibits all solicitation of employment, business, or contributions from any occupant of a vehicle and it does not distinguish between legally parked, illegally parked, or stopped vehicles. An alternative is not constitutionally adequate if it is facially prohibited by the challenged ordinance.
Finally, the City claims that strip mall parking lots adjacent to the main areas in which day laborers congregate can operate as alternative avenues of communication. This suggestion is at odds with the City’s assertion that it enacted the Ordinance in part due to the complaints of those very local business owners. Comite, 475 F.Supp.2d at 967 n. 9. The City has not shown that the proprietors of these establishments are willing to allow day laborers to congregate in their parking lots, so it cannot be said that this alternative is actually available.
The City relies on Robins v. Pruneyard Shopping Center, 23 Cal.3d 899, 153 Cal.Rptr. 854, 592 P.2d 341 (1979), aff'd 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), and its progeny to argue that day laborers are free to exercise their First Amendment rights on private property, even over the objection of property owners. In Pruneyard, the California Supreme Court held that the California Constitution’s guarantee of freedom of expression, Cal. Const, art. I, §§ 2-3, “protects] speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned.” Pruneyard, 23 Cal.3d at 910, 153 Cal.Rptr. 854, 592 P.2d 341. Under Pruneyard, property owners may be compelled to allow expressive activity only where the premises have become the “ ‘functional equivalent of a traditional public forum.’ ” Albert-son’s, Inc. v. Young, 107 Cal.App.4th 106, 118, 131 Cal.Rptr.2d 721 (2003) (citing Golden Gateway Ctr. v. Golden Gateway Tenants Ass’n., 26 Cal.4th 1013, 1033, 111 Cal.Rptr.2d 336, 29 P.3d 797 (2001)). California courts have explicitly rejected a broad reading of Pruneyard that would compel any store or facility that is “freely and openly accessible to the public” to allow expressive activity. See, e.g., Albertson’s, 107 Cal.App.4th at 118, 131 Cal. Rptr.2d 721 (holding the “freely and openly accessible” inquiry to be a “threshold” requirement).
The private parking lots the City suggests as alternative avenues of communication are attached to small, individual “proprietor-type operations, such as a *1212 doughnut shop, gas stations, restaurants and a ‘7-Eleven.’ ” Comite, 475 F.Supp.2d at 967. It strains reality to argue that a doughnut shop or gas station has become the “functional equivalent” of a public forum like the massive outdoor shopping center in Pruneyard. Rather, as the district court found, “California courts have eschewed the application [of] Pruneyard to smaller spaces, such as the parking lots of large grocery stores.” Id. For example in Albertson’s, the California Court of Appeal concluded that individuals did not have the right to solicit in front of an Albertson’s store, notwithstanding that it was part of a large complex built around a common parking lot. 107 Cal.App.4th at 121, 131 Cal.Rptr.2d 721. The Court of Appeal reasoned, in part, that there were no “enclosed walkways, plazas, courtyards, picnic areas, gardens, or other areas that might invite the public to congregate.” Id. Similarly, in Trader Joe’s, the same court concluded that a Trader Joe’s store and parking lot did not become the functional equivalent of a public forum simply because it was open to the public. The Court of Appeal there stated that “[f]ew would argue that a free-standing store, with abutting parking space for customers, assumes significant public attributes merely because the public is invited to shop there.” Trader Joe’s Co. v. Progressive Campaigns, Inc., 73 Cal.App.4th 425, 434, 86 Cal.Rptr.2d 442 (1999). Like Albert-son’s or Trader Joe’s, the small individual proprietorships involved in this case lack any indicia of a public forum, thus rendering Pruneyard inapplicable.
The City asserts that property owners’ objections are merely speculative. The City belies its own record; it is undisputed that property owners’ objections to day laborers were a driving force behind the adoption of the Ordinance. It defies common sense to conclude that property owners who objected to the day laborers congregating on public sidewalks near them, prompting the City to enact the Ordinance in the first place, would acquiesce to a proposal that would move the day laborers directly onto their private property. The City next argues that, were the property owners to object, the day laborers would be entitled to assert their right to assemble under Pruneyard. However, the burden is on the City — not the Plaintiffs — to prove the existence of alternative avenues of communication. As detailed above, the City has failed to demonstrate even a colorable argument that Pruneyard applies to the individual proprietorships it promotes as an alternative to city sidewalks. The City cannot meet its heavy burden for justifying restrictions on First Amendment rights by simply pointing to a legal doctrine and inviting the Plaintiffs to engage in what would likely be a protracted, losing legal battle.
Each of the potential alternatives asserted by the City is either inapplicable or constitutionally defective. Thus, because the City failed to meet its burden of demonstrating the presence of alternative avenues of communication, the Ordinance is not a valid time, place, and manner regulation.
III.
The majority tramples upon the right of free speech in the most traditional of public fora. It erroneously relies upon precedent involving an as-applied challenge to the constitutionality of an aspirationally similar statute and contorts the actual words of the Redondo Beach Ordinance beyond recognition. The district court got it right: The Redondo Beach Ordinance is an unconstitutional regulation of speech; it is not narrowly tailored to meet Redondo Beach’s asserted governmental interests; and it fails to leave open alternative ave *1213 nues for the day laborers’ expression. I would affirm the district court’s grant of summary judgment to Jornaleros and NDLON as well as the award of attorneys’ fees and costs to them.

. Day laborers comprise Jornaleros's and NDLON’s membership. Both associations exist to protect and advance the interests of day laborers-a goal that is unquestionably hampered by the Redondo Beach ordinance. Thus, I agree with the district court’s ruling that Plaintiffs have standing to pursue their constitutional challenge.
Although I agree that NDLON and Jornaleros have standing, the majority gives Redondo Beach’s standing argument short shrift. Redondo Beach argues that plaintiffs cannot "satisfy the Lujan test for standing because plaintiffs have not demonstrated a legally protected interest — i.e., the legal right to work in the United States.” The City asserts that "plaintiffs are soliciting the commission of a crime by the prospective employers (hiring an illegal alien) and they seek to commit a crime of their own (working in the United States without a legal right to do so).” Redondo Beach contends that "[j]ust as state laws against prostitution and drug dealing are not open to challenge by those who seek to violate them, day laborers who are soliciting work without the legal right to work in the United States have no standing to challenge Redondo Beach's anti-solicitation ordinance.” The City's underlying assumption is that all day laborers are "illegal aliens,” and are therefore criminally prohibited from seeking jobs in the United States. This assumption, however, is neither supported by the facts of this case nor the law. But even if the City's prejudgment as to the day laborers’ immigration status were correct, it is legally beside the point. The First Amendment protects individuals, regardless of their immigration status. Am-Arab Anti-Discrimination Comm. v. Reno, 70 F.3d 1045, 1063-64 (9th Cir.1995), rev’d on other grounds, 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999); see also Plyler v. Doe, 457 U.S. 202, 210, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons’ guaranteed due process of law by the Fifth and Fourteenth Amendments.”).

. For example, Professor Martín Redish construes the First Amendment as ultimately serving the principle of "individual self realization” — the ability of individuals to realize their full potential and the goals they have set for their lives. See generally Martin H. Redish, The Value of Speech, 130 U. Pa. L.Rev. 591 (1982). Alexander Meiklejohn viewed the First Amendment as aiding individuals in making the informed decisions critical for self-government. See Alexander Meiklejohn, Political Freedom 24-28 (1960). Perhaps most famously, John Stuart Mill argued that a "marketplace of ideas” was required insofar as "[c]omplete liberty of contradicting and disproving our opinion is the very condition which justifies us in assuming its truth for purposes of action.” John Stuart Mill, On Liberty 11 (Longmans, Green, & Co. 1921) (1859). Broad access to traditional public fora directly advances each of these asserted interests.

. For present purposes, I assume that the district court's conclusion that the regulation is content neutral is correct. However, this is a closer question than it appears. See Berger, 569 F.3d at 1051.

. It is of no import that the City Attorney attempted to craft an ordinance modeled on the Phoenix ordinance at issue in ACORN. The City obviously failed to do so, and no amount of back-pedaling — short of amending the Ordinance — can fix it now. By its plain terms the Redondo Beach Ordinance reaches much more First Amendment protected expression than did the Phoenix ordinance.

. The ACORN panel dismissed this argument as "simply represent[ing] a misreading of the Phoenix ordinance. The ordinance does not prohibit all solicitation even in the streets. It prohibits only solicitation in the streets ‘from the occupants of any vehicle.’ " ACORN, 798 F.2d at 1272. To the extent language in the ACORN opinion purports to consider a "facial overbreadth” argument that is anything other than the tagging rights ACORN asserts, it is obviously dicta. See Espinosa v. United Student Aid Funds, Inc., 553 F.3d 1193, 1199 n. 3 (9th Cir.2008) ("Anything [a prior case] has to say as to matters not presented in that case is, in any event, dicta and thus not binding on us.”).

. The district court correctly found, and Jornaleros and NDLON do not challenge, that the City has significant interests in traffic flow and safety, crime prevention, and esthetic appearance of the public fora. Comite, 475 F.Supp.2d at 964 (citing Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 507-08, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981); Heffron v. Int’l Soc’y for Krishna Consciousness, Inc., 452 U.S. 640, 650, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); Martin v. Struthers, 319 U.S. 141, 144, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); G.K. Ltd. Travel v. City of Lake Oswego, 436 F.3d 1064 (9th Cir.2006); ACORN, 798 F.2d at 1268). For purposes of this appeal, however, the City has only asserted its interest in traffic flow and safety.

. The majority makes much of the fact that the ACORN court found these to be available alternatives when reviewing the Phoenix ordinance. This argument, however, displays the majority’s fundamental misunderstanding of the nature of the solicitation at issue. As demonstrated above, the ACORN court examined only the statute as applied to ACORN’s method of soliciting contributions of funds. While ACORN could not "tag” occupants of cars by entering the roadway, they could effectively raise money for their objectives through a multitude of alternative channels. Here, by contrast, the transitory, informal nature of day laborer employment and the reality of how day laborers are sought out and hired renders these same alternatives illusory.